MEMORANDUM DECISION
 

 CALLISTER, Chief Judge.
 

 I. INTRODUCTION
 

 This matter comes before the Court on defendant’s motion to dismiss and the parties’ cross-motions for summary judgment. In an extensive stipulation filed with the Court, all the material facts in this case have been agreed to by the parties. This proceeding calls into question the validity of Idaho’s act of rescinding its prior ratification of the proposed “Equal Rights Amendment” to the Constitution of the United States, and the constitutionality of Congress’ act in extending the time period in which ratifications may be received. The plaintiffs bringing this suit consist of the State of Idaho, the leadership of the Idaho State Legislature, and individual legislators of that body; the State of Arizona, legislative leadership of both houses and individual legislators from the Arizona legislature. These plaintiffs are joined by the plaintiffintervenors, legislators from the State of Washington. They seek from this Court a declaration that, as a matter of federal constitutional law, Idaho’s act of rescinding its prior ratification is valid and effective; that Congress’ extension of the seven-year time limitation in which to present ratifications is unconstitutional in that it violates the grant of power given Congress under article V of the Constitution, and that the running of the seven-year time limitation tolls and terminates any ratifications enacted by the states to that point. Furthermore, the plaintiffs seek a mandatory injunction directing the defendant, the Administrator of General Services Administration, Rear Admiral Rowland G. Freeman III, to remove the name of the State of Idaho from all official records which would indicate that Idaho has adopted the proposed twenty-seventh amendment and return its prior ratification documents. Finally, the plaintiffs petition for an order enjoining the Administrator of General Services Administration from taking further account of any purported ratifications after the expiration of the original ratification period.
 

 On May 13 and 14, 1981, oral argument was presented by the defendant, represented by the Department of Justice, and defendant-intervenors, the National Organization for Women, on their motions to dismiss or in the alternative for summary judgment; plaintiffs and plaintiff-intervenors’ cross-motion for summary judgment was also considered at that time. These motions present the Court with essentially questions of first impression necessitating consideration of the premises of one of the pivotal provisions of the United States Constitution, the article V amending clause. In addition, the Court is confronted with the perennially perplexing problem of the legitimate relationship of the courts with the coordinate branches, particularly the Congress, in determining whether the questions presented here are proper for judicial resolution. After careful consideration of the difficult issues presented, it appears that the weight of constitutional precedent dictates that the defendant and defendant-intervenors’ motion to dismiss or in the alternative for summary judgment should be dismissed and plaintiffs’ motion for summary judgment should be granted in accordance with the principles discussed below.
 

 II. BACKGROUND
 

 In March of 1972 Congress passed a resolution proposing the “Equal Rights Amend
 
 *1106
 
 ment,” as the twenty-seventh amendment to the Constitution of the United States, and submitted it for ratification to the legislatures of the states:
 

 JOINT RESOLUTION
 

 Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.
 

 Resolved by the Senate and House of Representatiyes of the United States of America in Congress assembled (two-thirds of each House concurring therein),
 
 That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:
 

 “ARTICLE—
 

 “SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
 

 “SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
 

 “SEC. 3. This amendment shall take effect two years after the date of ratification.
 

 H. J.Res. 208, 86 Stat. 1523 (1972). From the advent of the amendment and until 1978, 35 of the requisite 38 state legislatures took action ratifying the amendment and sent official certifications of their actions to the General Services Administrator pursuant to 1 U.S.C. § 106b.
 
 [1]
 
 But, in that same time period five states, Nebraska, Tennessee, Idaho, Kentucky, and South Dakota, while initially assenting to ratification, passed resolutions of rescission withdrawing their prior consent.
 
 [2]
 
 The original seven-year ratification restriction set in the resolution proposing the “Equal Rights Amendment” would have expired on March 22, 1979, had not Congress taken action to extend the time period.
 

 On October 6, 1978, an extension resolution, House Joint Resolution 638, was presented to Congress for consideration. It read:
 

 Joint Resolution
 

 Extending the deadline for the ratification of the Equal Rights Amendment.
 

 Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,
 
 That notwithstanding any provision of House Joint Resolution 208 of the Ninety-second Congress, second session, to the contrary, the article of amendment proposed to the States in such joint resolution shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States not later than June 30, 1982.
 

 While a majority of both Houses favored the extension resolution, proponents of the measure could not generate a two-thirds concurrence as had been the case when the original time period had been enacted. Therefore, the House acting by a vote of 253 to 189 and the Senate acting by a vote
 
 *1107
 
 of 60 to 36
 
 [3]
 
 enacted the extension resolution by a simple majority. The resolution was later signed by the President. ■
 

 The State of Idaho, which requires a super-majority, two-thirds, of the legislature to act in adopting an amendment, took action the first year the Equal Rights Amendment was proposed. The Idaho House of Representatives adopted Senate Joint Resolution No. 133 on March 24, 1972, by a vote of 31 to 4 and later that day the Senate passed it by a vote of 39 to 5. A certificate of ratification was duly issued by the Idaho Secretary of State and dispatched on March 29, 1972.
 

 A JOINT RESOLUTION RATIFYING THE PROPOSED AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES RELATIVE TO EQUAL RIGHTS FOR MEN AND WOMEN.
 

 Be It Resolved by the Legislature of the State of Idaho:
 

 WHEREAS, the Ninety-second Congress of the United States of America, at its second session, in both houses, by a constitutional majority of two-thirds thereof, has made the following proposition to amend the Constitution of the United States of America in the following words, to-wit:
 

 “JOINT RESOLUTION
 

 “Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.
 

 “RESOLVED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED (TWO-THIRDS OF EACH HOUSE CONCURRING THEREIN), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:
 

 “ARTICLE—
 

 “ ‘SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
 

 “SECTION 2. The Congress shall have the power to enforce by appropriate legislation, the provisions of this article.
 

 “SECTION 3. This amendment shall take effect two years after the date of ratification.’ ”
 

 NOW, THEREFORE, BE IT RESOLVED by the Forty-first Idaho Legislature that the proposed amendment to the Constitution of the United States of America be, and the same is hereby ratified by the Forty-first Idaho Legislature.
 

 Adopted by the Senate March 24, 1972.
 

 Adopted by the House March 24, 1972
 
 [4]
 

 In February of 1977 the state legislature of Idaho took action to rescind its prior ratification of the proposed Equal Rights Amendment. On February 4, 1977, House Concurrent Resolution 10
 
 [5]
 
 was introduced
 
 *1108
 
 and passed by the House by a vote of 44 to 26. On February 8,1977, the Senate passed HCR 10 by a vote of 18 to 17. Thus, by a simple majority Idaho declared its prior ratification “rescinded, voided, repealed, withdrawn, recalled and disaffirmed ....”
 
 [6]
 
 The Secretary of the State of Idaho certified Idaho’s rescission to the Acting Administrator of the General Services Administration. The certification was duly received and noted blit questioned as to its validity. The State of Idaho and legislators then brought this action to declare its validity and compel the proper entry of Idaho’s action of rescission, including the return of the prior certificate of ratification.
 

 Unlike Idaho, the State of Arizona has not taken official action purporting to ratify or adopt the proposed twenty-seventh amendment; but rather has consistently acted to reject the proposed amendment in every legislative session from 1973 until 1978. With the passage by the Ninety-fifth Congress of House Joint Resolution 638 purporting to extend the time period in which to consider the amendment, the Arizona State Legislature approved a House Concurrent Resolution 2014 which called for the instigation of this suit.
 
 [7]
 

 The State of Washington, by its legislature, ratified the proposed Equal Rights Amendment on March 22, 1973, and the certification of that act was forwarded to the Administrator of General Services. Washington has not taken any subsequent actions which are inconsistent with that initial determination of ratification. Four individual legislators brought suit in the Western District of Washington on the first day of the extended ratification period seeking the nullification of Congress’ act extending the period and a return of Washington’s certificate of ratification.
 
 [8]
 
 The focal point of that action was the claim that Washington’s ratification was conditioned on a full ratification by three-fourths of the States within the seven-year time period. The legislators argued that because the ratification period had lapsed without three-fourths of the states ratifying, Washington’s ratification was now null and void, and Congress’ action in extending the time period did not extend Washington’s ratification. On June 13, 1979, the four legislators filed a notice of voluntary dismissal in the Washington suit and moved to intervene in this case to pursue the same issues. Their motion was granted June 13, 1979.
 

 
 *1109
 
 III. THE ISSUES
 

 As indicated earlier the issues presented in this litigation are ones of first impression. A number of prominent Supreme Court cases have dealt with interpretations of the amendment clause, article V of the federal Constitution,
 
 [9]
 
 but none have made direct holding on any of the questions considered here. While the areas that the Court is asked to address deal ostensibly with an interpretation of the fundamental nature of the process of amending the Constitution,
 
 [10]
 
 at the threshold, however, are questions of justiciability that would preclude consideration of any of the substantive issues if they are found applicable. First, the Court must consider if the proper parties are before the Court and whether the issues raised are “ripe” for adjudication. If these hurdles are overcome, the Court must then consider whether the questions proffered are not properly “political questions” and thus better left to the legislative or executive branch. Only if these preliminary questions are found not to bar this Court’s jurisdiction is it proper for the Court to address what have been denoted the merits of the case, which are: first, whether or not a rescission of a prior ratification is a proper exercise of the state’s power under article V to act on a proposed amendment. A subsidiary issue to this inquiry is that if a rescission is a proper exercise of the state’s authority, is Idaho’s resolution of rescission proeedurally flawed. Second, is it a proper exercise of congressional authority under article V to alter a previously proposed time limitation for ratification; if so, must Congress act by two-thirds majority or would a simple majority suffice. Third, assuming the propriety of the congressional extension of the ratification period, how does the extension affect a state which has supposedly enacted its ratification conditioned upon the original time limitation placed on the amendment. Finally, a question is raised with regard to the propriety of the mandatory injunctive relief requested by the plaintiff.
 

 IV. JUSTICIABILITY
 

 The starting point for any discussion of justiciability is article III of the Constitution which limits the scope of judicial power to “cases” and “controversies.” U.S. Const. Art. Ill, § 2. These words are inherently ambiguous and accordingly their meaning has been dependent upon judicial interpretation. The Supreme Court in a series of noted cases has interpreted the article III limitation as a restriction of its jurisdiction to those “questions presented in an adversary context ... in a form historically viewed as capable of resolution through the judicial process.”
 
 Flast v. Cohen,
 
 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968).
 
 [11]
 
 The Court has articu
 
 *1110
 
 lated certain minimum prerequisites to adjudication — parties with standing and issues that are ripe and not moot, hypothetical, or political — that are necessary and sufficient conditions for securing what may be called the substantive judgment of the Court. Each of the justiciability standards has grown and evolved under scrutiny of a number of significant cases giving the courts an understanding of what type of questions and cases are meant to be resolved by the judicial branch.
 

 The concepts of ripeness, standing and political question are all separate aspects of justiciability, the absence of ripeness or standing or the presence of a political question precludes a court from further consideration of the case.
 
 See Buckley v. Valeo,
 
 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (ripeness);
 
 Baker v. Carr,
 
 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (political question);
 
 Gladstone, Realtors v. Bellwood,
 
 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (standing). At the present time there does not appear to be any firm, fixed rule as to the order of applying these elements of justiciability,
 
 Schlesinger v. Reservists to Stop the War,
 
 418 U.S. 208, 215, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706; however, there is some authority that where these questions are before the court and none have been resolved definitively in a context readily applicable to the case presented, the court should determine the questions of standing and ripeness first.
 
 American Jewish Congress v. Vance,
 
 575 F.2d 939 (D.C.Cir.1978). The reason for this procedure appears to be that an analysis of the standing and ripeness questions require only an inquiry into the limitations placed on the federal judicial power by article III. The political question issue, on the other hand, goes beyond a determination of article III limitations and requires an inquiry into other articles of the Constitution as well as consideration of basic notions of separation of powers.
 
 Id.
 
 at 943. As between standing and ripeness, no clear preference appears to exist as to which should be considered first. Since standing focuses on the parties and the nature of their injuries, and ripeness considers whether those alleged injuries have matured sufficiently or are properly defined so as to permit judicial resolution, it appears logical to approach standing first.
 

 A.
 
 Standing
 

 Among the areas of justiciability, the standing doctrine has proven to be one of the most intricate, troublesome, and confusing aspects of modern constitutional law. The Supreme Court has at times indicated that “[sjtanding has been called one of the most amorphous [concepts] in the entire domain of public law,”
 
 Flast v. Cohen,
 
 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), and that “[generalizations about standing to sue are largely worthless as such.”
 
 Data Processing Serv. v. Camp,
 
 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The lack of clear articulation is not surprising in that it has been noted that the concept of standing reflects the court’s consideration of the judiciary’s proper role under our Constitution and in our democratic society.
 
 [12]
 
 This does not mean, however, that the courts are left without direction.
 

 Beginning with the “cases” or “controversy” limitation found in article III, the Supreme Court has indicated that the standing is directed to one narrow question.
 

 The fundamental aspect of standing is that it
 
 focuses on the party seeking to get his complaint before
 
 a federal court
 
 and not on the issues he wishes to have adjudicated.
 
 The “gist of this question of standing” is whether the party seeking relief has “alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon
 
 *1111
 
 which the court so largely depends for illumination of difficult constitutional questions.”
 
 Baker v. Carr,
 
 369 U.S. 186, 204, 82 S.Ct. 691 [703], 7 L.Ed.2d 663 (1962). In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable.
 

 Flast
 
 v.
 
 Cohen, supra
 
 392 U.S. at 99, 88 S.Ct. at 1952 (emphasis added).
 

 The emphasis, therefore, is directed to the litigant and whether he is in a position to have the courts decide the merits of the dispute or resolve the particular issues presented by his complaint. In order to make this inquiry, the Supreme Court has indicated that “both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise . . . . ”
 
 Warth v. Seldin,
 
 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) must be considered.
 

 The constitutional limitations referred to by the court have been outlined as requiring a showing by the plaintiff that he personally has suffered some actual or threatened injury — injury in fact- — ,
 
 Id.
 
 at 501, 95 S.Ct. at 2206, to an interest “arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.”
 
 Data Processing Serv. v. Camp, supra,
 
 397 U.S. at 152-53, 829-30. Furthermore, the injury must flow from the putatively illegal conduct of the defendant, i.e., there must be a fairly traceable causal connection between the claimed injury and the challenged conduct.
 
 Arlington Height v. Metro. Housing Corp.,
 
 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977);
 
 Simon v. Eastern Ky. Welfare Rights Org.,
 
 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-26, 48 L.Ed.2d 450 (1976). Finally, the plaintiff must establish that a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury.
 
 Gladstone, Realtors v. Bellwood,
 
 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). With regard to these latter two formulations, the court in
 
 Duke Power Co. v. Carolina Env. Study Gp.,
 
 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), stated these criteria in the alternative indicating that the causation requirement is satisfied if the plaintiff establishes that the injury was the consequence of the defendants’ actions
 
 or
 
 that exercise of the court’s remedial powers would redress the injury.
 
 Id.
 
 at 74, 98 S.Ct. at 2630-31.
 
 See Riegle v. Federal Open Market Committee,
 
 656 F.2d 873, 878 (D.C.Cir., 1981).
 

 The Supreme Court points out that even if these constitutional limitations are met a plaintiff may still lack standing under “the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim.”
 
 Gladstone, Realtors v. Bellwood, supra,
 
 441 U.S. at 99-100, 99 S.Ct. at 1608 (1979). That is, the Court essentially looks to see if the litigant is asserting an injury which is peculiar to himself or to a distinct group of which he is a part, rather than one shared in “substantially equal measure by all or a large class of citizens.”
 
 Id.
 

 Therefore, this Court’s inquiry into the question of standing as it arises in this case must proceed along the lines of whether or not the constitutional and prudential limitations permit judicial determination of the merits, i.e., have the individual plaintiffs established that they (1) have suffered some actual or threatened injury
 
 [13]
 
 which is pecu
 
 *1112
 
 liar- to themselves, (2) to an interest protected by the relevant law, (3) where the injury is caused by defendant’s action or capable of judicial redress.
 
 See, Riegle v. Federal Open Market Committee, supra.
 

 One additional point should be noted before beginning analysis of the question of standing. Since the focal point of the standing issue is whether or not the plaintiffs are the proper parties to raise the particular questions and not the validity of the merits, and because it is clear that when ruling on a motion to dismiss for want of standing, “both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party,”
 
 Warth v. Seldin,
 
 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).
 

 In a review of the complaint and its prayer for declaratory and injunctive relief, it is evident that the Court must assume the following: (1) the defendant wrongfully refused to accept Idaho’s certification of rescission, and failed to properly report that Idaho was no longer within the group professing to have ratified; (2) the ratifications submitted by Idaho and Washington expressly limited their consent to adoption for a period of seven years and thus became null and void on March 22, 1979; (3) Congress’ act in passing the extension resolution was unconstitutional and void; and (4) the defendant wrongfully maintains that he can continue to hold as binding all ratifications heretofore received and continue to accept any subsequent ratifications. In light of these assumptions the Court will consider the plaintiffs’ claim of standing. Compare
 
 Riegle v. Federal Open Market Committee,
 
 supra, at 877.
 

 Each of the plaintiffs in this suit has presented the Court with an impressive array of facts and legal theories which support their claim of standing. From a review of the record there appears to be one group of plaintiffs, the individual legislators from the State of Idaho, who, if found to have standing, are in a position to present all of the pertinent issues in this case. If these plaintiffs are found to be proper parties, the Court will not need to consider claims of standing by the other plaintiffs in order to resolve the issues presented or grant the relief requested. The basis for the Idaho legislators’ claim of standing in this suit is that as participants in the ratification process, their individual votes, in favor of ratification for the seven-year time period
 
 [14]
 
 or for the rescission of the prior ratification
 
 [15]
 
 have been debased by the actions of the defendant and a suit of this nature is proper to vindicate their vote. In assessing this basis for standing, it should be noted that while recently state and national legislators have turned to the courts to pursue their causes,
 
 [16]
 
 there are no special standards for determining their standing vis-a-vis a private litigant,
 
 Harrington v. Bush,
 
 553 F.2d 190 (D.C.Cir.1977). Thus the legislator must meet the same three-prong test articulated above as any other litigant would.
 

 The injury to a protected interest that the legislators assert as a basis for their standing in this case stems from an impairment of a vote cast in favor of the proposed constitutional amendment, or in favor of the resolution rescinding the prior ratification. The right to vindicate a properly cast vote has been verified in a number of cases;
 
 *1113
 
 two of particular importance in this case are
 
 Coleman v. Miller,
 
 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) and
 
 Kennedy v. Sampson,
 
 511 F.2d 430 (D.C.Cir.1974).
 
 Coleman v. Miller, supra,
 
 is important in this instance for two reasons: first,
 
 Coleman
 
 dealt with a challenge to the ratification of a proposed amendment under Article V. Second,
 
 Coleman
 
 is one of the origins of the concept of standing based on an action to vindicate a vote which has been in some way impaired. The
 
 Coleman
 
 case dealt with Kansas’ attempt to ratify a proposed amendment to the federal Constitution known as the Child Labor Amendment. The Child Labor Amendment was first proposed in June of 1924.
 
 [17]
 
 While several states ratified the amendment, the Kansas legislature in 1925 adopted a resolution rejecting the proposed amendment. Fourteen years later Kansas again considered the amendment. The Senate vote on the ratification resolution resulted in a 20-20 tie among the 40 senators. The lieutenant governor then stepped in as the presiding officer of the Senate and cast his vote in favor of the resolution. The resolution was later adopted by the House of Representatives. Suit was brought by 24 members of the legislature, including the 20 senators who had voted against the resolution in the Senate, to restrain the certification of ratification. A suit was brought challenging the right of the lieutenant governor to cast the deciding vote in the Senate arguing that he was not part of the “legislature” as specified in article V of the Constitution. The plaintiffs also challenged the proposed ratification on the grounds that the prior rejection by Kansas barred any subsequent reconsideration, and since Kansas had failed to ratify within a reasonable time the amendment had lost its vitality. The plaintiffs’ suit was challenged on the ground that the petitioners did not have standing to raise these questions. The Kansas Supreme Court found that the plaintiffs had standing but ruled against the plaintiffs on the substantive issues. On appeal to the Supreme Court of the United States, the court held that
 

 the cases cited in support of the contention, that petitioners lack an adequate interest to invoke our jurisdiction to review, to be inapplicable. Here, the plaintiffs include twenty senators, whose votes against ratification have been overriden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes. . Petitioners come directly within the provisions of the statute governing our appellate jurisdiction. They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given , effect ....
 

 Id.
 
 at 438, 59 S.Ct. at 975.
 

 The court based this holding on a review of a series of cases arising under challenges to proposed amendments particularly
 
 Hawke v. Smith, No. 1,
 
 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920), and
 
 Leser v. Garnett,
 
 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922). The Court pointed out that standing was granted to the plaintiff in
 
 Hawke v. Smith, No. 1, supra,
 
 who was suing as a “citizen and elector of the State of Ohio,” and in
 
 Leser v. Garnett, supra,
 
 to “qualified voters” in the State of Maryland. Of these decisions the court wrote:
 

 The interest of the plaintiffs in
 
 Leser v. Garnett
 
 as merely qualified voters at general elections is certainly much less impressive than the interest of the twenty senators in the instant case. This is not a mere intra-parliamentary controversy but the question relates to legislative action deriving its force solely from the provisions of the Federal Constitution and the twenty senators were not only qualified to vote on the question of ratification but their votes, if the Lieutenant Governor were excluded as not being a
 
 *1114
 
 part of the legislature for that purpose, would have been decisive in defeating the ratifying resolution.
 

 We are of the opinion that
 
 Hawke v. Smith
 
 and
 
 Leser v. Garnett
 
 are controlling authorities ....
 

 Coleman v. Miller, supra
 
 307 U.S. at 441, 59 S.Ct. at 976.
 

 The
 
 Coleman
 
 precedent was followed and elucidated somewhat by the court in
 
 Kennedy v. Sampson, supra.
 
 In that case Senator Edward Kennedy of Massachusetts, plaintiff, filed suit against the Administrator of General Services Administration seeking a declaration that the Family Practice of Medicine Act
 
 [18]
 
 had become law and an order requiring the defendant to publish the Act as a validly enacted law. The Family Practice of Medicine Act had been passed by large margins in both the Senate and the House, and was presented to the President for his approval on December 14, 1970. Both Houses thereafter adjourned for the Christmas holidays. The President neither signed nor vetoed the measure but issued a statement disapproving the bill and announcing that he would not sign it. Senator Kennedy, the chief proponent of the Act and one of the Senators who had voted in favor of it, maintained that the President’s actions in disapproving the action resulted in a “pocket veto” which would automatically become law after ten days. In the alternative, Senator Kennedy argued that if the President’s actions could be considered a veto, the Act should be returned for further consideration by Congress. As it stood, Senator Kennedy argued that his vote had been impaired because the Act had neither become law nor had he been given his right to vote on an override. A major barrier to Senator Kennedy’s suit was the question of standing. On appeal the circuit court concluded that “any of the traditional methods of evaluating the standing of a party to sue”
 
 Id,
 
 at 433, would support the plaintiff’s claim of standing. In particular the court reviewed
 
 Coleman
 
 and stated that:
 

 [T]he office of United States Senator does confer a participation in the power of the Congress which is exercised by a Senator when he votes for or against proposed legislation. In the present case, appellee has alleged that conduct by officials of the executive branch amount to an illegal nullification not only of Congress’ exercise of its power, but also of appellee’s exercise of his power. In the language of the
 
 Coleman
 
 opinion, appellee’s object in this lawsuit is to vindicate the effectiveness of his vote. No more essential interest could be asserted by a legislator. We are satisfied, therefore, that the purposes of the standing doctrine are fully served in this litigation.
 

 Id.
 
 307 U.S. at 436, 59 S.Ct. at 974.
 

 It follows, therefore, that
 
 Coleman
 
 and
 
 Kennedy
 
 support the proposition that a plaintiff in his position as a legislator, and having full authority to act in that office, exercises his right to vote on a matter and that if that vote or opportunity to vote is nullified that the plaintiff has a protected interest in vindicating his vote. The plaintiffs here are specially empowered under article V to participate in the amendment process, and are therefore asserting a judicially recognizable injury particular to themselves and not what might be termed a “general grievance.” The plaintiffs have exercised their right to participate in the amendment process by voting in favor of ratification and at a subsequent time voting for rescission of that prior ratification. With reference to the assumptions that must be drawn from the complaint, it is clear that the plaintiffs’ acts have been infringed and held for naught in that they have not been given the full effect that was intended. For example, the actions of Congress in lengthening the ratification period and extending Idaho’s ratification into a period which was not contemplated initially expressly impinges upon the plaintiffs’ action of ratifying only for the limited period and gives rise to an action to vindicate the intent of their vote. In the same vein, the refusal to recognize the plaintiffs’ act of rescinding the prior ratification as fully and completely retracting the prior expression
 
 *1115
 
 impinges on the legislator’s right to participate in the ratification process and gives rise to a cause of action. The plaintiffs in this instance have established direct injury in fact to their constitutionally protected interest of participating in the process of amending the Constitution and thus the first bar to standing has been met.
 

 The inquiry must now shift to the question whether or not there is a “causal connection” or “logical nexus” between the actions of the defendant and the injury suffered by the plaintiffs. In addressing the problem of standing to raise the question of the right of rescission, an essential part of this inquiry is into the nature of the duties of the defendant as found in 1 U.S.C. § 106b.
 
 [19]
 
 While the plaintiffs argue that the defendant exercises a discretionary function in determining whether a ratification has been made in “accordance] [with] the provisions of the Constitution,” the defendant maintains his function is merely ministerial. If the defendant’s authority is discretionary, then there would exist a direct causal link between his actions of not giving full effect to the rescission and the impairment of the plaintiffs’ vote. If, however, the defendant’s acts are merely ministerial, then no causal connection would exist. Rather than attempt to resolve one of the merits in this case under a consideration of standing, and following the principle laid down by
 
 Harrington v. Bush, supra,
 
 the material allegations of the complaint must be accepted as true, thus the defendant’s acts must be considered discretionary. In doing so, it becomes clear that the causal connection between the defendant’s act and the plaintiffs’ injury is fulfilled.
 

 With regard to the alleged injury flowing from the extension of the time limitation, the defendant argues that no causal connection exists between any act of his and the injury to the plaintiffs, if any, because such would flow from the congressional act of passing the extension resolution. The court in
 
 Riegle v. Federal Open Market Committee, supra,
 
 dealing with a similar argument, indicated that where the causation requirement is not met because the named defendants are not the actual cause of the injury, e.g., in
 
 Riegle
 
 the cause of the injury was the Congress’ act in passing 12 U.S.C. § 263(a) and not the committee’s actions pursuant to that statute, it is proper to allege as a defendant those parties who act “unconstitutionally under the law . . . and not the legislature which enacted the statute.
 
 See generally, Marbury v. Madison,
 
 5 U.S. 1 Cranch 137, 175-80, 2 L.Ed. 60 (1803).”
 
 Id.
 
 at 879 n.6.
 

 Finally, since the causation requirement can also be met by showing that “prospective [judicial] relief will remove the harm,”
 
 Warth v. Seldin, supra,
 
 422 U.S. at 498-99, 95 S.Ct. at 2204-05,
 
 see Duke Power v. Caroline Env. Study Gp., supra,
 
 and it is clear that the plaintiffs’ alleged injury can be redressed by a declaration by this Court regarding the constitutionality of the various acts of rescission and extension, this requirement can be satisfied by the Court’s consideration of and resolution of the merits.
 

 It is clear from the foregoing review of the constitutional and prudential limitations to the Court’s jurisdiction that the Idaho legislators are proper parties to bring this suit in that they have met all of the requirements for standing outlined by the Supreme Court. Furthermore, since they are also proper plaintiffs to raise all of the . issues presented by this suit, the Court need not determine the merit of the other plaintiffs’ assertions of standing.
 

 B.
 
 Ripeness
 

 A second consideration for the Court in determining justiciability is whether or not the action and the issues presented are sufficiently ripe for adjudication. “As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, ‘concrete legal issues, presented in actual cases, not abstractions,’ are requisite. This is as true of declaratory judgments as any other
 
 *1116
 
 field.”
 
 United Public Workers v. Mitchell,
 
 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). While some of the considerations found in standing may overlap in the analysis of ripeness, they are nevertheless founded on essentially different inquiries. “Unlike the doctrine of standing, which establishes that the plaintiff must have sufficient interest in a case, or the requirement that the controversy must be real and not collusive, the doctrine of ripeness focuses upon the extent to which the controversy has matured at the time of the litigation.”
 
 Dyer
 
 v.
 
 Blair,
 
 390 F.Supp. 1287, 1289 (N.D. Ill.E.D., 1974). Thus the focus is shifted away from the litigants themselves and turned to the development of the issues to assure that the parties are so arrayed with adverse legal interests and in such a concrete fashion as to warrant judicial relief.
 
 Golden v. Zwickler,
 
 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969);
 
 Aetna Life Insurance Co. of Hartford, Conn. v. Haworth,
 
 300 U.S. 227, 240-41, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937).
 

 Recently, Justice Powell held that the issues in
 
 Goldwater v. Carter,
 
 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) were not ripe for judicial determination. He wrote:
 

 This Court has recognized that an issue should not be decided if it is not ripe for judicial review.
 
 Buckley v. Valeo,
 
 424 U.S. 1, 113-114 [96 S.Ct. 612, 679-80, 46 L.Ed.2d 659] (1976)
 
 (per curiam).
 
 Prudential considerations persuade me that a dispute between Congress and the President is not ready for judicial review unless and until each branch has taken action asserting its constitutional authority. Differences between the President and the Congress are commonplace under our system. The differences should, and almost invariably do, turn on political rather than legal considerations. The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse.
 

 Id.
 
 at 997, 100 S.Ct. at 534.
 

 Since
 
 Goldwater
 
 dealt with the question of the allocation of power between two coordinate branches of government, the President and the Congress, in the process of terminating a mutual defense treaty, the constitutional impasse that Justice Powell was looking for was the assertion of apparently conflicting constitutional powers. Congress, however, had not taken any action with regard to the President’s cancellation of the treaty. Thus, until Congress took action asserting what might be perceived as its authority under the Constitution, the case would not be ripe for adjudication. This case presents a somewhat similar situation. The essential questions here relate to the allocation of power of two entities— the state legislatures and Congress — acting under the auspices of article V. The inquiry is, therefore, whether inconsistent or conflicting positions have been taken regarding that power which would create the type of impasse necessary for judicial interpretation.
 

 An initial argument relied on by the defendant should be dealt with at this juncture of the Court’s consideration of the question of ripeness. The defendant argues that questions such as those raised by this litigation are not ripe until three-fourths of the states have acted in ratifying. He argues that since the amendment process consists of “succeeding steps in a single endeavor,”
 
 Dillon v. Gloss,
 
 256 U.S. 368, 375, 41 S.Ct. 510, 512, 65 L.Ed. 994 (1921), until all the steps are taken, questions arising from that process are not ripe for adjudication. Whatever the logical appeal this argument might have, the Court is not at liberty to accept this approach in light of the overwhelming caselaw to the contrary. The Court is not aware of nor has it been referred to any case under article V that has been dismissed on the grounds that the case is not ripe because all the steps have not been taken. Rather, it appears that numerous Supreme Court and lower court cases have resolved specific substantive and procedural questions relating to article V prior to ratification by three-fourths of the states.
 
 See Kimble v. Swackhamer,
 
 439 U.S. 1385, 99 S.Ct. 51, 58 L.Ed.2d 225
 
 *1117
 
 (1978);
 
 Dyer v. Blair,
 
 390 F.Supp. 1291 (N.D.Ill.1975);
 
 [20]
 

 Trombetta v. Florida,
 
 353 F.Supp. 575 (M.D.Fla.1973);
 
 Coleman v. Miller,
 
 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939);
 
 United States v. Sprague,
 
 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640 (1931);
 
 Leser v. Garnett,
 
 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922);
 
 National Prohibition Cases,
 
 253 U.S. 350, 40 S.Ct. 486, 64 L.Ed. 946 (1920);
 
 Hawke v. Smith, No. 2,
 
 253 U.S. 231, 40 S.Ct. 498, 64 L.Ed. 877 (1920);
 
 Hawke v. Smith, No. 1,
 
 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920);
 
 Dillon v. Gloss,
 
 256 U.S. 368, 41 S.Ct. 510, 65 L.Ed. 994 (1921);
 
 Hollingsworth v. Virginia,
 
 3 U.S. 3 Dall 378, 1 L.Ed. 644 (1798). Therefore, the Court must review the actions of the defendant and plaintiffs to determine whether or not they have exercised their authority under article V so as to create a constitutional impasse, noting always that the Court in reviewing the defendant’s motion to dismiss for lack of ripeness, it must construe the material portions of the plaintiffs’ complaint against the moving party and in a light most advantageous to the plaintiffs.
 
 Warth v. Seldin,
 
 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).
 

 Considering the question of the propriety of the extension resolution passed by Congress, the plaintiffs, the Idaho legislators, exercised their authority under article V by enacting a ratification resolution which is good for only the seven-year period originally proposed by Congress. The congressional act extending the ratification period continues Idaho’s ratification into a period to which it has not consented thus contravening the asserted intent of their ratification. Both the parties have exercised what they argue are their powers granted under Article V, and there is no subsequent act necessary to bring the question of extension into issue. The Idaho plaintiffs have acted to ratify for the seven-year period and Con-
 

 gress has abrogated that vote by extending it beyond the period intended by those ratifying, thus, since the extended period began, Idaho has had a continuing injury that is ripe for judicial resolution.
 

 Turning to the question of the ripeness of the rescission issue, it appears that it also is ripe for much the same reason. The state legislature passed a resolution rescinding its prior ratification of the Equal Rights Amendment, and certified that fact to the Administrator of General Services. The act of rescission served the dual purpose of (1) establishing the state’s position regarding the ratification of the proposed amendment, and (2) cancelling its prior act of ratification. Again accepting as true the material allegations of the complaint, i.e., Idaho’s authority to rescind its prior ratification, and the defendant’s exercise of discretion to determine that the state rescission is not to be given full effect, then the fact that the defendant has refused to remove Idaho’s name from the official lists of those who are considered as having ratified, but has merely reported the rescission along with the ratification is a sufficient assertion of an adverse power to create that impasse necessary for adjudication. The actions of the defendant in refusing to give full effect to the state’s rescission, both lets stand the prior ratification which the state no longer supports and refuses to recognize its present position, and gives rise to a fully ripe conflict of the type proper for the courts to resolve.
 

 Since the issues are properly before the Court, and presented by the proper parties, the Court must now determine whether the questions are those which are to be decided by the courts or by another one of the co-equal branches.
 

 C.
 
 Political Question
 

 Defendant maintains that if the questions presented in the instant case are
 
 *1118
 
 determined to be otherwise justiciable, the case is barred from consideration by this Court because it presents a non-justiciable ^“political question.” The case law in the /federal courts uniformly holds that a cause I of action presenting a “political question” will not be adjudicated by the courts.
 
 Goldwater v. Carter,
 
 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979);
 
 Powell v. McCormack,
 
 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969);
 
 Baker v. Carr,
 
 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In outlining the parameters of the political question doctrine, the Supreme Court established that “it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary’s relationship to the States, which gives rise to the ‘political question’ .... The nonjusticiability of a political question is primarily a function of the separation of powers.”
 
 Baker v. Carr, supra
 
 at 210, 82 S.Ct. at 706. While the questions presented for this Court’s determination deal essentially with the relationship and allocation of authority between the Congress and the states pursuant to article V of the Constitution, the antecedent question of who decides what that relationship is must be decided. That, it is contended, brings into play the potential bar of the “political question” doctrine.
 
 [21]
 

 The Supreme Court has given six formulations of the political question doctrine, any one of which operates as a “velvet blackjack”
 
 [22]
 
 removing this Court’s power to exercise jurisdiction over these matters. The six criteria are:
 

 a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 

 Baker v. Carr, supra
 
 at 217, 82 S.Ct. at 710.
 

 An analysis of the question of the state’s power to rescind a prior ratification and Congress’ power to extend the ratification deadline, along with the initial question of who decides these questions, should be considered in conjunction with these six formulations of the political question doctrine to determine whether or not this Court is barred from further consideration of this matter.
 

 1.
 
 Textually Demonstrable Constitutional Commitment to a Coordinate Political Department
 

 In
 
 Goldwater v. Carter, supra,
 
 Justice Brennan wrote that the “political question” doctrine restrains courts’ review of an exercise of a policy decision made by a
 

 
 *1119
 
 coordinate political branch to which authority to make that judgment has been “constitutionally] commit[ted]”
 
 Baker v. Carr,
 
 369 U.S. 186, 211-213, 217 [82 S.Ct. 691, 706-08, 710, 7 L.Ed.2d 663] (1962). But the doctrine does not pertain when a court is faced with the
 
 antecedent
 
 question whether a particular branch has been constitutionally designated as the repository of political decisionmaking power.
 
 Cf. Powell v. McCormack,
 
 395 U.S. 486, 519-521 [89 S.Ct. 1944, 1962-63, 23 L.Ed.2d 491] (1969). The issue of decisionmaking authority must be resolved as a matter of constitutional law, not political discretion; accordingly, it falls within the competence of the courts.
 

 Goldwater v. Carter, supra
 
 444 U.S. at 1006-7, 100 S.Ct. at 539.
 

 In a somewhat similar vein the court in
 
 Baker v. Carr, supra,
 
 wrote that “[d]eciding whether a matter has in any measure been committed by the Constitution to another branch of government ... is itself a delicate exercise in constitutional interpretation and is a responsibility of this Court as ultimate interpreter of the Constitution.” 369 U.S. at 211, 82 S.Ct. at 706. In addition, the Supreme Court has indicated that
 

 In order to determine whether there has been a textual commitment to a coordinate department of the Government, we must interpret the Constitution .... we must first determine what power the Constitution confers . . , before we can determine to what extent, if any, the exercise of that power is subject to judicial review.
 

 In other words, whether there is a “textually demonstrable constitutional commitment of the issue to a co-ordinate political department” of government and what is the scope of such commitment are questions we must resolve ....
 

 Powell v. McCormack, supra
 
 395 U.S. at 519, 521, 89 S.Ct. at 1963, 1964.
 

 Therefore, in order to determine the existence and extent of any “textual commitment” to the various actors under article V it is necessary to turn to the Constitution itself in order to determine the allotment of powers among the participants and the degree to which each is subject to judicial review or interpretation. While it is noted that the text of the Constitution does not expressly deal with either of the substantive questions presented nor does it direct either the Congress or the judiciary to determine how article V should be interpreted, this fact “is not in itself controlling; for with the Constitution, as with a statute or other written instrument, what is reasonably implied is as much a part of it as what is expressed.”
 
 Dillon v. Gloss,
 
 256 U.S. 368, 373, 41 S.Ct. 510, 512, 65 L.Ed. 994 (1921). In attempting to determine what is implied by article V, it appears appropriate for the Court to try first to ascertain why article V was structured as it is and what the intent of the framers was in providing for this section of the Constitution. In order to do so the philosophical and historical underpinnings of article V must be scrutinized. In addition, since the courts have not been reluctant in interpreting article V, the authoritative case law must be reviewed.
 

 Before embarking on a review of the allocation of powers under article V to determine the existence of a constitutional commitment of the pending issues to a particular party, one of the defendant’s contentions must be considered. The defendant argues that the whole of this case is barred from judicial consideration because the Congress is granted exclusive and plenary control over all phases of and questions arising out of the amendatory procedure. A three-judge court in
 
 Dyer v. Blair,
 
 390 F.Supp. 1291 (1975) addressed this proposition. Judge Stevens (now Justice Stevens) wrote:
 

 There is force to . .. [this] argument since it was expressly accepted by four Justices of the Supreme Court in
 
 Coleman v. Miller,
 
 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385. But since a majority of the Court refused to accept that position in that case, and since the Court has on several occasions decided questions arising under article V, even in the face of “political question” contentions, that ar
 
 *1120
 
 gument is not one which a District Court is free to accept.
 

 Dyer v. Blair, supra
 
 at 1299,1300 (footnotes omitted).
 

 Furthermore, a review of article V reveals that the judiciary, while only dealing with article V in a handful of cases, has nevertheless dealt with virtually all the significant portions of that article. These decisions considered and interpreted the following underlined portions of article V:
 

 The Congress,
 
 whenever two thirds of both Houses shall deem it necessary, shall propose
 
 Amendments
 
 [23]
 
 to this Constitution, . . .
 
 which . . . shall be valid to all Intents and Purposes, as part of this Constitution
 

 [24]
 
 , when ratified
 
 [25]
 
 by the
 
 Legis
 
 latures
 
 [26]
 
 of three fourths of the several States, or by Conventions in three fourths thereof, as the
 
 one or the other Mode of Ratification may be proposed by the Con
 
 gress
 
 [27]
 
 ....
 

 U.S.Const. Art. V (emphasis and footnotes added).
 

 Finally, as will be pointed out later, giving plenary power to Congress to control the amendment process runs completely counter to the intentions of the founding fathers in including article V with its particular structure in the Constitution.
 
 [28]
 
 Therefore, in accordance with the holding in
 
 Dyer
 
 and the overwhelming precedent established in the case law arising under article V, the position taken by the defendant that the Congress is empowered to decide all issues concerning the amendment process is clearly foreclosed, leaving this Court with the more difficult question of determining the various allocations of power under article V and the areas wherein judicial review is precluded. For this it is necessary to turn to the foundations of article V and an understanding of the purposes and operation of this critically important section of the Constitution.
 

 Professor Lester B. Orfield in his seminal work on the constitutional amendment clause, The Amending of the Federal Constitution (1942), offers an insightful, analytical beginning point in understanding the function of article V and the interrelationship of the entities involved in that process by considering the philosophical contributions made by article V.
 
 [29]
 
 Professor Or-field points out that in the realm of political-philosophy and legal institutions, the idea of a written constitution developed at a late stage of Western Civilization and at
 
 *1121
 
 the forefront of this development was the American experience. The doctrine of popular sovereignty had a strong appeal to the inhabitants of the colonies, and because the people were considered sovereign it followed that the people could create a constitution to dictate the legal structure of their government. Furthermore, as part of establishing a constitution, it also follows that once created, the constitution could also provide a mechanism for changing or amending the document. This idea of amending an organic instrument, Professor Orfield points out, is markedly and uniquely American and has a dramatic impact on the philosophical concept of
 
 legal
 
 sovereignty.
 

 A legal sovereign, as opposed to the popular sovereign (or those who are the source of public opinion, etc.) by definition is a person or body which is said to have unlimited lawmaking power which is not subject to any person or body legally superior to him; or in other words, the legal sovereign is defined as having unlimited lawmaking or legislative power. By way of illustration, in the English system the Parliament is the legal sovereign in that whatever it legislates is the supreme law of the land. A dictatorship has the despot as its legal sovereign for the same reason. In the American experience, however, even though the people have been referred to as the source of all political power, the creation of a written constitution shifted the ultimate lawmaking powers from the people, as a whole, and spread it among the various branches of government. It is this shift of power from the people to the constitutional structure that creates the question of where the legal sovereignty resides. In analyzing each of the possible alternatives, Professor Orfield in turn rejected the proposition that legal sovereignty rested in the states, either individually or collectively; the federal government; or the states and the federal government jointly, or finally the judiciary. Professor Orfield’s resolution of the question of the location of legal sovereignty was that it ultimately resides in the amending body as constituted and governed by article V. Professor Orfield wrote:
 

 Finally it must be seen that the status of the amending body has an important bearing on the controversy over the nature and extent of the powers of the federal government and the states, and on the general doctrine of sovereignty. Sovereignty rests in neither the federal government nor in the states, but, if it may be said to reside anywhere, in the amending body. The amending capacity demonstrates neither the supremacy of the states nor of the federal government. At one time it may operate in favor of the states, and at another in favor of the federal government. That the rights of neither will be impaired is guaranteed by their joint action in the amending process. Both are but agents of the composite states.
 

 Id.
 
 at 164-5.
 

 Regarding the amending body as the repository of legal sovereignty has an interesting impact on the perception of the amendment process and the participants therein. Initially it should be noted that the two participants listed in article V having a part in the amendment process — Congress and the state legislature or state convention- — comprise an independent body which solely has the power to alter the fundamental laws of the land. In short, a body which transcends both federal and state authority. When acting as part of the amending body, both participants act pursuant to the power and authority granted by article V and their traditionally defined roles have no bearing on their authority to either limit or expand them.
 
 See Hawke v. Smith, No. 1,
 
 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920) (“ratification by a State of a constitutional amendment is not an act of legislation within the proper sense of the word .... The power to ratify a proposed amendment to the Federal Constitution has its source in the Federal Constitution.”
 
 Id.
 
 at 229-30, 40 S.Ct. at 497-98);
 
 Hollingsworth v. Virginia,
 
 3 U.S. 3 Dall 378, 1 L.Ed. 644 (1798). (In proposing or acting on a proposed constitutional amendment Congress is not acting pursuant to its “ordinary” legislative powers found in article I but acts according to those powers granted
 
 *1122
 
 under article V.
 
 Id.
 
 at 380 n.(a)). Within article V each of the participants are assigned certain powers which appear to be carefully balanced and approximately equally distributed. For example, Professor Orfield, in commenting upon the proposition that the states are really the sovereign in that amendments are ultimately ratified by them, writes that
 

 [a]n amendment is never brought about without prior initiation by Congress. Even when a constitutional convention is applied for by the state legislatures, the call must go forth from Congress. Congress, moreover, has the power to select the mode of ratification. Looked at from one angle, Congress has a dual capacity in proposing amendments. It actually initiates the amendment, while, at the same time, its vote in favor of it is in a way a vote of ratification, inasmuch as, without it, the amendment cannot even go before the states. It is in Congréss that amendments have been buried. The initiatory powers of the state legislatures have never as yet been brought to a successful fruition. It thus appears that the powers of the federal government with reference to amendments are fully equal to those of the states. A true sovereign must therefore embrace both governments.
 

 Id.
 
 at 154.
 

 Thus, each participant works within his scope of authority in order to bring about constitutional change. The authority of each appears to be delicately balanced to avoid any unseemly encroachment or potential for abuse. This balance between the participants works from the premise that both are the agents of the people, the sole legitimate source of constitutional change, representing them in markedly different fashions. James Madison made reference to this balance in his writing in the
 
 Federalist Papers.
 
 He wrote:
 

 If we try the Constitution by its last relation to the authority by which amendments are to be made, we find it neither wholly
 
 national
 
 nor wholly
 
 federal.
 
 Were it wholly national, the supreme and ultimate authority would reside in the
 
 majority
 
 of the people of the Union; and this authority would be competent at all times, like that of a majority of every national society, to alter, or abolish its established government. Were it wholly federal, on the other hand, the concurrence of each State in the Union would be essential to every alteration that would be binding on all. The mode provided by the plan of the convention is not founded on either of these principles. In. requiring more than a majority, and particularly in computing the proportion by
 
 States,
 
 not by
 
 citizens,
 
 it departs from the
 
 national
 
 and advances towards the
 
 federal
 
 character; in rendering the concurrence of less than the whole number of States sufficient, it loses again the
 
 federal
 
 and partakes of the
 
 national
 
 character.
 

 Federalist Paper #39
 
 (Madison).
 

 The careful balance between the participants in the amendment process is critical to understand in order to assess the full scope of authority each has been assigned. For such an understanding it is necessary to probe the deliberations of the founding fathers in their drafting of article V, as well as their experiences under local state charters, constitutions, and, the Constitution’s predecessor, the Articles of Confederation.
 

 It appears that the founding fathers were well schooled in the concept of the amendability of governing laws. Most, if not all, of the original states had constitutions or charters which provided for orderly change, by amendment, pursuant to specific procedures.
 
 [30]
 
 When the Articles of Confederation were drafted provision was made for amendments of error, but concern' was expressed at the same time that the ability to
 
 *1123
 
 amend would augment the power of the national government to the detriment of the autonomy of the states.
 
 See, Federalist Papers #21
 
 (Hamilton). The Articles of Confederation reflected this fear of a strong national government by emphasizing both the autonomy of the states and the delegated limited authority to the national government. The amendment provision found in the Articles of Confederation was written to ensure the states’ continued control over the national government. This was done by virtually precluding any substantive change in the basic distribution of power between the national government and the states. The amendment provision read:
 

 The Articles of this Confederation shall be inviolably observed by every State, and the Union shall be perpetual; nor shall any alteration at any time hereafter be made in any of them, unless such alteration be agreed to in a Congress of the United States, and be afterwards confirmed by the legislatures of
 
 every
 
 State.
 

 Articles of Confederation, art. XIII,
 
 Documents of American History
 
 115 (5th ed. Commanger 1949). (emphasis added)
 

 The requirement of a perfect consensus of the states effectively precluded change thus protecting the autonomy of the states but it had the devastating effect of undermining the ability of the government under the Articles of Confederation to respond to political and economic crises.
 
 [31]
 
 As history bears out any attempt under the Articles of Confederation to strengthen the national government was defeated by some individual or coalition of states. This inability to respond adequately to crises under the Articles of Confederation was one of the main concerns that eventually led to the Constitutional Convention of 1787.
 
 [32]
 

 The framers’ experience with the Articles of Confederation underscored the need for an amending process in the new constitution that would allow the government and the political system to respond effectively to a changing political, social and economic environment. The framers attempted to construct a written constitution that could undergo change when necessary, and, by implication, that could change in a manner that would effectively respond to specific problems. While on the one hand, they sought an amendatory process that would promote necessary and effective constitutional change, the framers also firmly maintained their view that the people, as the original source of all legitimate powers, must consent to any change in the original document. This reference to a popular consensus is viewed as an important response to the particular fear of abuse of power by the national government. For example, Alexander Hamilton wrote in
 
 Federalist Paper # 22,
 
 “The fabric of American empire ought to rest on the solid basis of THE CONSENT OF THE PEOPLE. The streams of national power ought to flow immediately from that pure, original fountain of all legitimate authority.” (emphasis in original)
 

 Thus it was with a focus on promoting these two essential values — (1) flexibility to respond to pressures; and (2) the importance that the change proposed be supported by a consensus of the people — that the founding fathers sought to balance the amending power between the national and local representatives. Keeping this purpose in mind the Court turns to a consideration of the allocation of amending authority.
 

 When the Constitutional Convention assembled on May 14, 1787, and during the next several weeks, plans to improve the constitutional basis for government were
 
 *1124
 
 presented by Charles Pinckney (May 29), Edmund Randolf (May 29), and Alexander Hamilton (June 18).
 
 [33]
 
 The Virginia Plan as presented by Edmund Randolf consisted of fifteen resolutions. Resolution XIII provided for amendments as follows: “Resolved, that provision ought to be made for the amendment of the Articles of Union, whensoever it shall seem necessary; and that the assent of the National Legislature ought not to be required thereto.”
 
 [34]
 
 While some initial support was found for this proposal, two essential charges were brought against it: first, doubt was expressed as to the propriety of an amendment clause itself; second, and probably a more poignant challenge was made to the proposition that the national legislature was to be excluded from the amendment process. As for the first challenge, the amendment clause was adequately defended on the grounds that the new and difficult experiment entered into by the states would require periodic revision as was found under the Articles of Confederation.
 
 [35]
 
 An amendment provision would be needed to lend stability to the government and provide a reliance on orderly change rather than to trust in chance or violence.
 
 [36]
 
 The second challenge to the proposal regarding the participation of the national legislature in the amendment process appears to have stemmed from a fundamental apprehension of increasing federal power. In essence, the opponents to congressional participation in an act of such fundamental import as the reallocation of the basic distribution of power through constitutional amendment believed that giving Congress a substantial role would be “exceptional and dangerous” because in any action that would curb or affect on the national government’s authority, the Congress would abuse its power and refuse to assent to the change
 
 [37]
 

 An alternative plan proposed by Charles Pinckney visualized a more expanded role for Congress. In his “Plan of a Federal Constitution”, article XVI read:
 

 If two-thirds of the Legislatures of the States apply for the same, the Legislature of the United States shall call a convention for the purpose of amending the Constitution; or, should Congress, with the consent of two-thirds of each House, propose to the States amendments to the same, the agreement of two-thirds of the Legislatures of the States shall be sufficient to make the said amendments parts of the Constitution.
 
 [38]
 

 Alexander Hamilton supported the move to give Congress a significant part in the amendment process. He argued that
 

 [t]he State Legislatures will not apply for alterations; but with a view to increase their own powers. The National Legislature will be the first to perceive, and will be most sensible to, the necessity of
 
 *1125
 
 amendments; and ought also to be empowered, whenever two-thirds of each branch shall concur, to call a Convention. There could be no danger in giving this power, as the people would finally decide in the case.
 
 [39]
 

 Since it was felt that neither the states nor the Congress would act other than to promote its own interest or what it perceived to be the present need, the final draft of article V struck the middle ground of granting to each the power to propose amendments to the constitution. As Madison pointed out in defense of the presently constituted article V:
 

 That useful alterations will be suggested by experience could not be foreseen. It was requisite, therefore, that a mode for introducing them should be provided. The mode preferred by the convention seems to be stamped with every mark of propriety. It guards equally against that extreme facility which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults. It, moreover, equally enables the general and the State governments to originate the amendment of errors, as they may be pointed out by the experience on one side or on the other.
 

 Federalist Papers # 43.
 

 The workings of the balanced approach to proposing amendments is probably best explained by Alexander Hamilton.
 

 In opposition to the probability of subsequent amendments, it has been urged that the persons delegated to the administration of the national government will always be disinclined to yield up any portion of the authority of which they were once possessed. For my own part, I acknowledge a thorough conviction that any amendments which may, upon mature consideration, be thought useful, will be applicable to the organisation (sic) of the government, not to the mass of its powers; and on this account alone I think there is no weight in the observation just stated. I also think there is little weight in it on another account. The intrinsic difficulty of governing thirteen States at any rate, independent of calculations upon an ordinary degree of public spirit and integrity, will, in my opinion, constantly impose on the national rulers the necessity of a spirit of accommodation to the reasonable expectations of their constituents. But there is yet a further consideration, which proves beyond the possibility of a doubt that the observation is futile. It is this, that the national rulers, whenever nine States concur, will have no option upon the subject. By the fifth article of the plan, the Congress will be obliged “on the application of the legislatures of two thirds of the States [which at present amount to nine], to call a convention for proposing amendments, which shall be valid, to all intents and purposes, as part of the Constitution, when ratified by the legislatures of three fourths of the States, or by conventions in three fourths thereof.” The words of this article are peremptory. The Congress “shall call a convention.” Nothing in this particular is left to the discretion of that body. And of consequence, all the declamation about the disinclination to a change vanishes in air. Nor however difficult it may be supposed to unite two thirds or three fourths of the State legislatures, in amendments which may affect local interests, can there be any room to apprehend any such difficulty in a union on points which are merely relative to the general liberty or security of the people. We may safely rely on the disposition of the State legislatures to erect barriers against the encroachments of the national authority.
 

 Federalist Paper # 85.
 

 Thus, in promoting the first value of the amendment clause, i.e., providing a means by which the Constitution can remain responsive to change, authority was given to both the states and Congress to propose necessary amendments. The national government was given the power to propose
 
 *1126
 
 amendments because as Hamilton wrote the state legislatures can “erect barriers” against its encroachment. Since the power to propose is equally divided, the power to create barriers against the national government must flow from the distribution of authority in determining whether or not proper consent for the change is derived from the people.
 

 While the drafters of the Constitution found it appropriate to grant the same power to propose amendments to both the local and national governments, a somewhat different distribution of authority was applied for determining whether there is sufficient consensus or support for the change. Like the power to propose amendments,-both the states and Congress were given a part in determining the extent of consent but unlike the power to propose amendments, the authority given each is distinctly different. Article V gives Congress complete and unrestricted control of designating the “Mode of Ratification”, the power to propose which of the two local entities, the state legislature or state convention, will act in ratifying the amendment.
 
 [40]
 
 The essential purpose behind this grant of authority is for Congress to determine which of these entities will best reflect the local sentiment regarding the proposed amendment.
 
 [41]
 
 The states, on the other hand, acting through the body chosen by Congress, have the responsibility of ascertaining the local sentiment or actual popular consent regarding the amendment. It is clear that in formulating article V the framers found that the states could most accurately reflect the existence
 
 vel non
 
 of consent.
 

 In considering the scope of the power granted to Congress to set the mode of ratification the Court has found that certain natural inferences must be read into that delegation of authority. In
 
 Dillon v. Gloss,
 
 265 U.S. 368, 41 S.Ct. 510, 65 L.Ed. 994 (1921), a suit challenging Congress’ power to restrict the period in which an amendment can be considered by the states for ratification, the court observed that
 

 [w]e do not find anything in the Article which suggests that an amendment once proposed is to be open to ratification for all time, or that ratification in some of the States may be separated from that in others by many years and yet be effective. We do find that which strongly suggests the contrary. First, proposal and ratification are not treated as unrelated acts but as succeeding steps in a single endeavor, the natural inference being that they are not to be widely separated in time. Secondly, it is only when there is deemed to be a necessity therefor that amendments are to be proposed, the reasonable implication being that when proposed they are to be considered and disposed of presently. Thirdly, as ratification is but the expression of the approbation of the people and is to be effective when had in three-fourths of the States, there is a fair implication that it must be sufficiently contemporaneous in that number of States to reflect the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do.
 

 Of the power of Congress, keeping within reasonable limits, to fix a definite period for the ratification we entertain no doubt. As a rule the Constitution speaks in general terms, leaving Congress
 
 *1127
 
 to deal with subsidiary matters of detail as the public interests and changing conditions may require; and Article V is no exception to the rule. Whether a definite period for ratification shall be fixed so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification.
 

 Id.
 
 at 374-6, 41 S.Ct. at 512-13.
 

 As a subsidiary matter of detail, Congress has the power, pursuant to its authority to designate the mode of ratification, to set a reasonable time period in which ratification may take place. It is significant that the
 
 Dillon
 
 court in discussing the Congress’ power to set a particular time period for ratification spoke of the need for the amendment process being completed within a reasonably contemporaneous time period so as to indicate the existence of the proper crescendo of consent necessary for the amendment to legitimately become part of the Constitution. Thus, as part of its power under article V, Congress, as the national representative of the people, serves a uniquely national function of orchestrating the swell of support for the proposed amendment by determining whether or not each local state’s manifestation of the people’s will so relates with the timing of the proposal and the expressions of consent of the other states that it can realistically be said that the constitutional changes flow from a consensus of the people.
 

 The court in
 
 Coleman v. Miller,
 
 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) went on to clarify the nature of the determination that Congress must make in deciding whether or not an expression of consent is received within that reasonably contemporaneous time period.
 

 When a proposed amendment springs from a concept of economic needs, it would be necessary, in determining whether a reasonable time had elapsed since its submission, to consider the economic conditions prevailing in the country, whether these had so far changed since the submission as to make the proposal no longer responsive to the conception which inspired it or whether conditions were such as to intensify the feeling of need and the appropriateness of the proposed remedial action. In short, the question of a reasonable time in many cases would involve, as in this case it does involve, an appraisal of a great variety of relevant conditions, political, social and economic ....
 

 Id.
 
 at 453, 59 S.Ct. at 982.
 

 It is important to note that Congress’ part in determining whether or not a consensus has been reached in a reasonable contemporaneous time period is not one where they must initially or ultimately determine the actual existence of consent or consensus, for that determination Congress must look to the expressions of the states in their role of representing the people locally. Rather, the congressional determination is one of timing, i.e., whether the concepts which gave rise to the amendment continue in full force and effect during the period in which the states act in ratifying.
 

 This role of orchestrating the expressions of the states which Congress has under its power to propose the mode of ratification is appropriate for two related reasons. First, in its role as a national legislature the Congress is best suited to act in accumulating the states’ expressions of consent to formulate a broad picture of local consensus. Second, Congress, it would appear, is also best suited, because of the basic nature of the question, to determine whether or not the expressions of consent are sufficiently contemporaneous in time with each other and with the proposal of the amendment. For example, at the time of the Constitutional Convention the founding fathers saw the necessity of an amending clause as being predicated on the need for a process to meet and solve unanticipated constitutional crises. As such it was anticipated that the need for changing the Constitution would not arise in a theoretical vacuum but be brought about by socio/political economic forces which would serve as the impetus for the move to amend. An amendment, there
 
 *1128
 
 fore, would be a reasoned response to the particular pressures and a specific solution to them. It follows that as long as the socio/political, economic pressures continue, and the proposed amendment remains responsive to those pressures, it can be said that the amendment is still viable, and any state’s action in ratifying would be considered “contemporaneous” with all other actions on the amendment. If, however, a change occurs in the socio/political economic milieu, or in the proposed amendment’s ability to respond, then the amendment cannot be said to be viable nor would a state’s act in ratifying the amendment be “contemporaneous” with the spirit of the proposal or with other states which ratified soon after the amendment was proposed. In
 
 Dillon v. Gloss, supra,
 
 the Supreme Court cited with approval the statement
 

 that an alteration of the Constitution proposed today has relation to the sentiment and the felt needs of today, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived, and not again to be voted upon, unless a second time proposed by Congress.
 

 Id.
 
 265 U.S. at 375, 41 S.Ct. at 512.
 

 Therefore, since the essential inquiry regarding the contemporaneousness of the consensus is one in which the socio/political economic underpinnings are monitored, it would appear such an. exercise is clearly best suited to the capabilities of Congress.
 

 The states, on the other hand, have complete and exclusive power over the process of determining actual consent. They determine whether or not sufficient local consensus exists and the process by which that consensus is determined. It is this allocation of exclusive control over the actual process of ratification, or determination of actual consensus, that creates the “barrier to national encroachment” that the founding fathers saw as a necessity. The recognition of this local barrier to encroachment has been recognized in two areas, the procedure the states may follow in determining consent, and the actual determination of consent itself. For example, in
 
 Dyer v. Blair, supra,
 
 a three-judge district court was presented with the question of whether Congress or the states control the determination of a requisite majority in a state’s vote of ratification. After noting that article V fails to indicate one way or the other who should determine the voting requirement, the court wrote:
 

 We think the omission more reasonably indicates that the framers intended to treat the determination of the vote required to pass a ratifying resolution as an aspect of the process that each state legislature, or state convention, may specify for itself.
 

 This conclusion is consistent with— though by no means compelled by — the underlying philosophy of the framers with regard to the respective roles of the central government and the several state governments. Madison expressed the thought in urging ratification of the Constitution in The Federalist No. 45:
 

 The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.
 

 The Federalist No. 45, at 303 (Modern Library ed.) (Madison). The ratifying power did not, of course, “remain in the state governments” because it was treated by article V of the new Constitution. But the failure to prescribe any particular ratification procedure, or required vote to effectuate a ratification, is certainly consistent with the basic understanding that state legislatures should have the power and the discretion to determine for themselves how they should discharge the responsibilities committed to them by the federal government.
 

 Id.
 
 at 1306-7 (footnotes omitted).
 

 It has been unquestioningly determined that a state’s assessment of local consensus is binding and beyond reproach. It has been recognized that the official certification to the national government of the state’s action with regard to the proposed amendment is binding on both the national
 
 *1129
 
 government or its representative, and the courts thus creating that impregnable barrier which was intended. For example, the court stated in
 
 Leser v. Garnett,
 
 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505:
 

 The remaining contention is that the ratifying resolutions of Tennessee and of West Virginia are inoperative, because adopted in violation of the rules of legislative procedure prevailing in the respective States. The question raised may have been rendered immaterial by the fact that since the proclamation the legislatures of two other States — Connecticut and Vermont — have adopted resolutions of ratification. But a broader answer should be given to the contention. The proclamation by the Secretary certified that from official documents on file in the Department of State it appeared that the proposed Amendment was ratified by the legislatures of thirty-six States, and that it “has become valid to all intents and purposes as a part of the Constitution of the United States.” As the legislatures of Tennessee and of West Virginia had power to adopt the resolutions of ratification,
 
 official notice to the Secretary, duly authenticated, that they had done so was conclusive upon him,
 
 and, being certified to by his proclamation, is conclusive upon the courts.
 

 Id.
 
 at 137, 42 S.Ct. at 218 (emphasis added).
 

 This barrier to encroachment by either the Congress or the courts was confirmed by the Supreme Court in
 
 Chandler v. Wise,
 
 307 U.S. 474, 59 S.Ct. 992, 83 L.Ed. 1407 (1939). In
 
 Chandler
 
 a resolution of ratification was vetoed by the lieutenant governor of Kentucky who was acting in the governor’s absence. Suit was filed challenging the validity of the ratification on the basis of the veto, but before the summons was served on the governor an official notice of ratification was sent to the Secretary of State, attesting to the fact that Kentucky had duly ratified the amendment (the agent designated to receive ratifications, the predecessor to the present designate, the Administrator of General Services). The Supreme Court noted that “the writ of certiorari should be dismissed upon the ground that after the Governor of Kentucky had forwarded the certification of the ratification of the amendment to the Secretary of State of the United States there was no longer a controversy susceptible of judicial determination.”
 
 Id.
 
 at 477-8, 59 S.Ct. at 993. Finally, the courts have noted on several different occasions that “[i]t is the approval of the requisite number of states, not the proclamation [of the GSA or Congress], that gives vitality to the amendment and makes it part of the supreme law of the land.”
 
 United States ex rel. Widenmann v. Colby,
 
 265 F. 998, 1000.
 
 Accord Dillon v. Gloss, supra,
 
 265 U.S. at 376, 41 S.Ct. at 512-13. Therefore, when the states act on an amendment and certify that determination to Congress, that certification binds Congress leaving it only with the determination of the question of contemporaneousness. To view the powers of the state any differently would so dilute the balance anticipated by the founding fathers as to destroy the safeguards established in the amendment process.
 

 From the foregoing it becomes clear that the precise questions presented to this Court are not barred from judicial review because of a textual commitment to a coordinate branch of government. First, it is evident from the balance struck between the two participants in the amendment process that the framers did not intend either of those two parties to be the final arbiter of the process. It seems more logical that the courts, as a neutral third party, and having the responsibility of “guardian of the Constitution”
 
 [42]
 
 decide these questions raised under article V because the amending power was split between Congress and the states. The question of whether or not a rescission of a prior ratification is a proper exercise of a state’s power under article V is one that is not com
 
 *1130
 
 mitted to Congress, and should not be, but is appropriate for judicial interpretation under the Court’s authority to “say what the law is.”
 
 [43]
 
 Furthermore, while the question of the reasonableness of the ratification period is one committed to Congress, such is not the question presented here.
 
 [44]
 
 Rather, the question presented to the Court is one of procedure under article V and these procedural questions have been held to be ones which the Court must decide.
 
 [45]
 
 Dyer
 
 v. Blair, supra
 
 at 1301 n.24;
 
 National Prohibition Cases,
 
 253 U.S. 350, 386, 40 S.Ct. 486, 488, 64 L.Ed. 946 (1920).
 

 Since the “textually demonstrable commitment” formulation is not a barrier to the Court’s consideration of the issues presented in this suit, the Court must turn to the alternative problem of whether the questions presented by this case are not suitable for judicial determination because of a “lack of judicially discoverable and manageable standards.”
 

 2.
 
 Lack of Judicially Manageable Standard
 

 A number of important cases have dealt with the parameters of this formulation of the political question doctrine.
 
 Goldwater v. Carter,
 
 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979);
 
 Dyer v. Blair,
 
 390 F.Supp. 1287 (N.D.M.E.D., 1974);
 
 Powell v. McCormack,
 
 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969);
 
 Baker v. Carr,
 
 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962);
 
 Coleman v. Miller,
 
 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). More importantly several of these cases have dealt with this standard in the context of article V disputes.
 
 Dyer v. Blair, supra,
 
 and
 
 Coleman v. Miller, supra.
 
 From a review of these cases in light of the questions before this Court, it appears well settled that these issues are not barred from consideration by the Court for a lack of a judicially manageable standard.
 

 In
 
 Dyer v. Blair, supra,
 
 a three-judge district court was faced with a suit that
 
 *1131
 
 very nearly parallels the issues presented in this case. The state of Illinois took action to ratify the proposed Equal Rights Amendment. The plaintiffs who had been able to generate a majority support in favor of the amendment, but unable to get the requisite three-fifths majority, challenged the constitutionality of the Illinois super-majority restriction on ratification arguing that Congress, under its authority to promulgate proposed amendments, was the proper body to decide what voting majority is proper for ratification. The question presented for the court was the precise meaning of the term “ratified.” In considering a challenge to the suit on political question grounds, Justice Stevens, writing for the court, wrote:
 

 The strongest argument for regarding the issue presented by these cases as a “political question” rests on an asserted “lack of judicially discoverable and manageable standards for resolving it.”
 
 See Baker v. Carr,
 
 369 U.S. at 217, 82 S.Ct. at 710. That argument is buttressed by the holding in
 
 Coleman v. Miller,
 
 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 that the question whether the lapse of 13 years between the proposal of an amendment and the favorable action by the Kansas legislature made the ratification ineffective was a “political question” to be finally determined by Congress.
 

 That holding was based on the absence of any acceptable criteria for making a judicial determination of whether the proposed amendment had lost its vitality through lapse of time. The Court noted that different periods might be reasonable for different proposed amendments and that varying economic or social conditions might support differing conclusions. Such considerations, although entirely acceptable as a predicate for decision by political departments of the government, might be wholly inappropriate as a basis for judicial decision.
 

 Although the issue in . . . [this] case[] is somewhat comparable to the lapse of time issue in
 
 Coleman
 
 in that the criteria for judicial determination are, perhaps, equally hard to find, the answer does not depend on economic, social or political factors that vary from time to time and might well change during the interval between the proposal and ratification. A question that might be answered in different ways for different amendments must surely be controlled by political standards rather than standards easily characterized as judicially manageable.
 

 It is primarily the character of the standards, not merely the difficulty of their application, that differentiates between those which are political and those which are judicial. The mere fact that a court has little or nothing but the language of the Constitution as a guide to its interpretation does not mean that the task of construction is judicially unmanageable.
 

 We are persuaded that the word “ratification (sic) as used in article V of the federal Constitution must be interpreted with the kind of consistency that is characteristic of judicial, as opposed to political, decision making. We conclude, therefore, that whatever the word “ratification” means as it is used in article V, that meaning must be constant for each amendment that Congress may propose.
 

 Id.
 
 at 1301-3.
 

 Recently, in
 
 Goldwater v. Carter, supra,
 
 Justice Rehnquist, drawing heavily from
 
 Dyer,
 
 formulated a two-part test in the application of the lack of judicial standard formulation of the political question doctrine. The
 
 Goldwater
 
 case arose in conjunction with the turmoil surrounding the presidential termination of the mutual defense treaty with Taiwan. Suit was filed by several senators seeking a declaration that Senate approval was necessary before a treaty can be terminated. In a plurality opinion, Justice Rehnquist referred to both
 
 Coleman
 
 and
 
 Dyer
 
 to hold that the question of termination was “political” and thus non
 
 *1132
 
 justiciable. After a review of a part of the
 
 Coleman
 

 [46]
 
 case he wrote:
 

 Thus, Mr. Chief Justice Hughes’ opinion concluded that “Congress in controlling the promulgation of the adoption of a constitutional amendment has the final determination of the question whether by lapse of time its proposal of the amendment had lost its vitality prior to the required ratifications.
 
 Id.
 
 [307 U.S.] at 456 [59 S.Ct. at 983],
 

 I believe it follows
 
 a fortiori
 
 from
 
 Coleman
 
 that the controversy in the instant case is a nonjusticiable political dispute that should be left for resolution by the Executive and Legislative Branches of the Government. Here, while the Constitution is express as to the manner in which the Senate shall participate in the ratification of a treaty, it is silent as to that body’s participation in the abrogation of a treaty. In this respect the case is directly analogous to
 
 Coleman, supra.
 
 As stated in
 
 Dyer v. Blair,
 
 390 F.Supp.
 

 1291, 1302 (ND Ill.1975) (three-judge court):
 

 A question that might be answered in different ways for different amendments must surely be controlled by political standards rather than standards easily characterized as judicially manageable.
 

 In light of the
 
 absence of any constitutional provision governing the termination of a treaty, and the fact that different termination procedures may be appropriate for different treaties (see,
 
 e.g., n.l,
 
 infra) the instant case in my view also “must surely be controlled by political standards.”
 

 Id.
 
 at 1003, 100 S.Ct. at 537 (emphasis added).
 

 Thus Justice Rehnquist found that where (1) there is no specific constitutional provision governing the particular question at hand, and (2) where it is found that different answers might be appropriate in different situations, the question is one to be controlled by political standards and re
 
 *1133
 
 solved by one of the political arms of the government.
 

 Applying Justice Rehnquist’s test to the questions presented to this Court, it is certainly evident from the Court’s consideration of the structure of article V that the Constitution is silent as to a determination of the issues presented by the plaintiffs’ complaint. But, it is equally evident that the question of the state’s ability to rescind and the propriety of changing an established time limitation are ones which should not be answered “in different ways for different amendments.” Rather, it is clear that these questions are such that they “must be interpreted with the kind of consistency that is characteristic of a judicial as opposed to political, decision making.” To subject these questions to a variety of inconsistent interpretations or approaches would create an incurable uncertainty regarding the validity of the acts of the participants, severely crippling the amendment process. Such a result would violate the Supreme Court’s articulated purpose for the application of the political question doctrine, “a tool for maintenance of governmental order will not be so applied as to promote only disorder.”
 
 Baker v. Carr, supra
 
 369 U.S. at 215, 82 S.Ct. at 709.
 
 [47]
 

 Before considering how the questions of rescission and extension should be answered in the context of article V, the remaining “political question” formulations must be reviewed in order to determine if these questions are still proper for the Court.
 

 3.
 
 Do Prudential Considerations Counsel Against Judicial Intervention.
 

 The final four formulations of the political question doctrine found in
 
 Baker v. Carr, supra,
 
 which are the impossibility of resolution without an initial policy determination of a kind clearly for non judicial discretion, or the impossibility of a court’s undertaking independent resolution without expressing lack of respect due coordinate branches of government, or an unusual need for unquestioning adherence to a political decision already made, or the potentiality of embarrassment from multifarious pronouncements by various departments on one question, will be analyzed together since they all deal with inherently similar considerations. For example, Justice Powell in
 
 Goldwater v. Carter, supra,
 
 listed only three political question criteria. While the first two criteria were the same as those found in
 
 Baker v. Carr,
 
 the third inquiry was: “(iii) Do prudential considerations counsel against judicial intervention.”
 
 Id.
 
 444 U.S. at 998, 100 S.Ct. at 534. These prudential considerations “eoncern[ ] calling for mutual respect among the three branches of Government. Thus, the Judicial Branch should avoid ‘the potentiality of embarrassment [that would result] from multifarious pronouncements by various departments on one question.’ Similarly, the doctrine restrains judicial action where there is an ‘unusual need for unquestioning adherence to a political decision already made.”
 
 Id.
 
 at 1000, 100 S.Ct. at 535.
 

 Some of the aspects of these prudential considerations have been criticized if not eliminated from the political question analysis. In
 
 Goldwater
 
 Justice Powell addressed the problem of potential embarrassment from multifarious pronouncements on a question and indicated that “[interpretation of the Constitution does not imply lack
 
 *1134
 
 of respect for a coordinate branch.
 
 Powell v. McCormack, . . .
 
 [395 U.S.] at 548 [89 S.Ct. at 1978].”
 
 Id.
 
 at 1001, 100 S.Ct. at 536. He went on to point out that resolving constitutional questions pursuant to the court’s duty “ ‘to say what the law is,’
 
 United States
 
 v.
 
 Nixon,
 
 418 U.S. 683, 703 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1974), quoting
 
 Marbury v. Madison,
 
 1 Cranch 137, 177 [2 L.Ed. 60] (1803).”
 
 Id.,
 
 would eliminate rather than create, multiple constitutional interpretations.
 

 In the same vein, Justice Stevens writing in
 
 Dyer v. Blair, supra,
 
 analyzed the defendant’s allegation that the court should not rule on the question presented there because it could produce an “unseemly conflict between coordinate branches of government . . . . ” His response was: “We are persuaded, however, that this suggestion is foreclosed by the Supreme Court’s rejection of a comparable argument in
 
 Powell v. McCormack
 
 . . . . ”
 
 Dyer v. Blair, supra
 
 at 1300. Justice Stevens quoted the following section from
 
 Powell
 
 and then commented:
 

 Respondents’ alternate contention is that the case presents a political question because judicial resolution of petitioners’ claim would produce a “potentially embarrassing confrontation between coordinate branches” of the Federal Government. But, as our interpretation of Art. I, § 5, discloses, a determination of petitioner Powell’s right to sit would require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a “lack of the respect due [a] coordinate [branch] of government,” nor does it involve an “initial policy determination of a kind clearly for nonjudicial discretion.”
 
 Baker v. Carr,
 
 369 U.S. 186, at 217, 82 S.Ct. 691, at 710 [7 L.Ed.2d 663], Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts’ avoiding their constitutional responsibility. See
 
 United States v. Brown,
 
 381 U.S. 437, 462, 85 S.Ct. 1707,1722, 14 L.Ed.2d 484 (1965);
 
 Youngstown Sheet & Tube Co. v. Sawyer,
 
 343 U.S. 579, 613-614, 72 S.Ct. 863, 898, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring);
 
 Myers v. United States,
 
 272 U.S. 52, 293, 47 S.Ct. 21, 84 [71 L.Ed. 160] (1926) (Brandeis, J., dissenting).
 

 The Court’s reasoning in
 
 Powell v. McCormack
 
 requires a similar conclusion in this case. Decision of the question presented requires no more than an interpretation of the Constitution. Such a decision falls squarely within the traditional role of the federal judiciary to construe that document .... As the Supreme Court pointedly noted in its citation of
 
 McPherson v. Blacker,
 
 146 U.S. 1, 24, 13 S.Ct. 3, [6] 36 L.Ed. 869, the possibility that action might be taken in disregard of a final judicial determination is an “inadmissible suggestion.”
 

 Id.
 
 at 1300-1.
 

 Of the prudential considerations advanced by the case law dealing with this area only one appears to have any bearing on this case — is there a need for an “unquestioning adherence to a political decision already made.” Of all the political question formulations, this one appears to be the strongest precedent for declaring the issues of rescission and extension before the Court nonjusticiable. This is because the Supreme Court’s holding in
 
 Coleman v. Miller, supra,
 
 that a rejection followed by a ratification, an arguably similar act to a ratification followed by a rescission, was a political question since Congress had already made a determination of that issue. Furthermore, in dicta, the court in
 
 Coleman
 
 indicated that at the time Congress decided the rejection question, they also resolved the question of the effectiveness of a rescission. With regard to the question of extension, by the very act of passing the joint resolution extending the time period by a simple majority, Congress has rendered a determination
 
 *1135
 
 that it has the power to modify a proposed mode of ratification in that manner, thus leaving the Court with the question of whether or not there is a compelling prudential reason to give unquestioning adherence to that decision.
 

 At the outset it should be noted that little has been written on the parameters of this formulation of the political question barrier. Thus key provisions have yet to be clarified: for example, what is meant by “an unusual need” to adhere to a decision made by a political branch. It is unclear whether an “unusual need” is manifest by considerations that go beyond the traditional notions of separation of powers, or whether it is merely a reiteration of that basic requirement. Aside from the problem of a lack of guidance as to the application of the formulation the whole approach has been severely criticized. This criticism is based on the argument that “it seems an unusual approach for the body recognized as having the power to review acts of Congress to adopt and rely on an act of Congress as precedent . ...”
 
 [48]
 
 This argument is even more persuasive when one considers that presumably Congress’ own determination would have no binding effect on any subsequent Congress.
 
 [49]
 

 In the application of this prudential consideration calling for deference to a decision made by a political branch, one unequivocal factor necessary before the Court can take cognizance of this limitation on its jurisdiction is that there must be a clear, definitive decision in existence that the courts can defer to. In
 
 Coleman v. Miller, supra,
 
 apparently one of the first times this prudential consideration was given application, the court found that the question of the effectiveness of a ratification after a prior rejection was a political question based on the fact that “the political departments of the Government dealt with the effect of both previous rejection and of attempted withdrawal and determined that both were ineffectual in the presence of an actual ratification.”
 
 Id.
 
 307 U.S. at 449, 59 S.Ct. at 980. In reaching this conclusion, the court drew upon the history of the ratification of the thirteenth, fourteenth, and fifteenth amendments.
 
 Coleman, supra,
 
 is cited as precedent in this case, particularly with regard to the question of the validity of a rescission, for principally two reasons: First, while any reference to
 
 Coleman
 
 as to the effectiveness of a rescission is clearly dicta, the deference the court chose to give to the congressional resolution of the conflict over the adoption of the Civil War Amendments could also be applicable here since those amendments were confronted not only with questions of ratifications after prior rejections but also of rescissions after prior ratifications. Second, there are some analytical similarities between a rejection and a rescission which would indicate that they should be treated the same.
 

 The application of the
 
 Coleman
 
 decision, however, to the issues advanced in this case have been resisted on a number of different grounds. First, as mentioned earlier, statements regarding the effectiveness of a rescission in
 
 Coleman
 
 are dicta and have no precedential value. Second, the whole of the court’s analysis of the question of rejection is also dicta and thus should not be followed by the Court. Finally, if the Court is to look to congressional handling of the question of the effect of a rescission, a brief review of the full history of congressional decision making regarding this issue makes it clear that Congress has consistently refused to render a final decision. Thus it would be impossible for this Court to find a clear decision by the political branch on the question of the effect of a rescission to which it would be 'appropriate to defer.
 

 Turning attention to the first contention, there is little dispute that the
 
 Coleman
 
 court was not presented with the question
 
 *1136
 
 as to the effect of a rescission. Since the question was not before the court, any discussion regarding that issue would clearly be dicta and have only the force of its underlying analysis to persuade subsequent courts to follow. As for the second contention that the court’s holding that a “political question” is presented when there is an inquiry into the effectiveness of a ratification after a prior rejection is dicta, this allegation is derived from a strict reading of the
 
 Coleman
 
 decision. The
 
 Coleman
 
 court held that Congress has the power to declare a proposed amendment is no longer viable by refusing recognition of a state’s ratification where action has not been taken in a reasonably contemporaneous time period. Since in
 
 Coleman
 
 there was considerable doubt whether the Child Labor Amendment was still viable after thirteen years, as is evidenced by the fact that two dissenting justices insisted that the amendment had lapsed,
 
 [50]
 
 and a determination by Congress that the time period had indeed lapsed would have suspended the need for a determination of the effect of a prior rejection on a state’s subsequent ratification by rendering those questions moot. The court’s ruling on the question of ratification after a rejection would not have had to be made in .light of how Congress would have decided the question of a reasonable time limitation.
 

 Finally, the last and most substantial challenge to the
 
 Coleman
 
 decision — that no congressional decision regarding the issue in this case has been worthy of deference— bears careful scrutiny. From a review of the history of the proceedings surrounding the Civil War Amendments which served as the basis for the holding in
 
 Coleman
 
 and the subsequent actions of Congress regarding the amendment process, the Court is persuaded that, in fact, no decision has been made by a political branch which would necessitate the Court’s deferral of its constitutional function of interpreting the Constitution. The Court reaches this conclusion after considering the following review of the clear historical precedents found in the amendment process.
 

 The fourteenth amendment was proposed and sent to the states on July 21, 1866. By 1868, however, most of the northern states had ratified the proposal but all the ex-Confederate states, except Tennessee, had rejected the proposal. On January 11, 1868, before any state had attempted to change its mind either by ratifying after having rejected, or by retracting its prior consent, Senator Sumner of Massachusetts introduced a joint resolution which recited that 22 states had ratified the fourteenth amendment and declared that it was for all intents and purposes a part of the Constitution. Cong.Globe, 40th Cong., 2d Sess. 453 (1868). Twenty-two would have been three-fourths of those loyal states left in the Union at the end of the Civil War and those who proposed the amendment. A similar resolution was offered in the House of Representatives by Representative Bingham on January 13, 1868.
 
 Id.
 
 at 475. Two days later, the Ohio legislature voted to revoke its ratification which previously had been certified to the Secretary of State. On January 31, Sumner expressed the opinion that the attempted withdrawal of Ohio’s ratification was ineffective because the amendment was already a part of the Constitution. He declared:
 

 This amendment was originally proposed by a vote of two thirds of Congress, composed of the representatives of the loyal States. It has now been ratified by the legislatures of three fourths of the loyal States, being the same States which originally proposed it, through their representatives in Congress. The States that are competent to propose a constitutional amendment are competent to adopt it. Both things have been done. The required majority in Congress have proposed it; the required majority of States have adopted it. Therefore I say this resolution of the legislature of Ohio is
 
 brutum fulmen
 
 — impotent as words without force.
 

 Id.
 
 at 877 (emphasis added).
 

 The resolutions of ratification and rescission sent by Ohio were referred to the Senate
 
 *1137
 
 committee on the judiciary along with Senator Sumner’s motion.
 
 Id.
 
 at 453, 878. No further action was taken on the matters until July 9, 1868. During the interim, however, the Congress, on June 25, 1868, passed an act which conditioned representation in Congress of the recalcitrant southern states on the reorganization of their state governments and the ratification of the fourteenth amendment.
 
 Id.
 
 at 3857. Most of the southern states then took action to ratify the amendment including Louisiana, North Carolina, and South Carolina who had specifically rejected the amendment earlier. On July 9, 1868, the House called upon the Secretary of State to compile “a list of the States of the Union whose legislatures have ratified the fourteenth article of the amendment.”
 
 Id.
 
 at 3857. By this time New Jersey had acted in voting to revoke its prior ratification. In a certificate of the Secretary of State issued on July 20, 1868, listing those states that had ratified, Louisiana, North Carolina, South Carolina, Ohio and New Jersey were all included. The Secretary of State apparently had no doubts as to the ability of the legislatures of Louisiana, North Carolina, and South Carolina to reverse their earlier rejection, but as to the Ohio and New Jersey resolutions withdrawing consent, the proclamation stated:
 

 [i]t is deemed a matter of doubt and uncertainty whether such resolutions are not irregular, invalid, and therefore ineffectual ....
 

 [I]f the resolutions of the legislatures of Ohio and New Jersey ratifying the aforesaid Amendment are to be deemed as remaining in full force and effect, notwithstanding the subsequent resolutions of the legislatures of those States, which purport to withdraw the consent of said states from such ratification, then the aforesaid Amendment has been ratified in the manner hereinbefore mentioned, and so has become valid ....
 

 15 Stat. 706-07 (1868).
 

 On July 21, 1868, Georgia, under its newly-constituted government, ratified the fourteenth amendment.
 
 [51]
 
 That same day without debate, both houses passed a concurrent resolution declaring the Fourteenth Amendment to be part of the Constitution and that should be promulgated as such. Cong. Globe, 40th Cong., 2d Sess. 4296 (1868). In its resolution of promulgation compiled on July 28,1868, 30 states were listed including those that had rescinded and those that had ratified over their prior rejection. Also, Georgia was included in the proclamation. 15 Stat. 708-711 (1868). The proclamation indicated that the amendment had been ratified by these states “being three fourths
 
 and more
 
 of the several States of the Union.” Cong.Globe,
 
 supra
 
 at 4266 (emphasis added).
 

 Inasmuch as Congress did not act to declare the fourteenth amendment part of the Constitution until additional ratification over and above the ratifications of three-fourths of the loyal states had been certified, it is plausible to infer that the view expressed by Senator Sumner and Congressman Bingham that the amendment had become effective before the further ratifications or attempted withdrawals were made had been rejected. The resolution adopted by Congress declaring the amendment part of the Constitution, however, is not inconsistent with their thesis, particularly because no debate or legislative record can be found to indicate whether the “three fourths
 
 and more
 
 of the several states” accepts the view that only 22 states constitutes the three fourths, or whether 28 states were needed to fulfill the three-fourths requirement. Therefore, because the question of whether the seceding states should be counted in ascertaining the number of states necessary for ratification by three-fourths was inconclusively dealt with, it is impossible to find in this legislative history a clear endorsement of the proposition that Congress based its decision to declare the fourteenth amendment part of the Constitution on the fact that it found both
 
 *1138
 
 rejections and rescissions ineffective. Furthermore, if the Sumner-Bingham view is rejected and a full 28 out of 37 states were needed to constitute three-fourths, the fact that 30 states were included in the declaration of ratification makes it similarly impossible to determine whether or not Congress really decided that the two rescinding states, Ohio and New Jersey, were needed in order for the amendment to become part of the Constitution. In fact, it might be safe to say that the inclusion of the additional two states obviated the need to make that decision, and thus one was not made.
 

 In appraising the argument that Congress conclusively dealt with the questions of rejection and rescission in its promulgation of the fourteenth amendment, it is important to note that Congress has never considered that decision to be determinative of the issues. This is demonstrated by the actions of essentially the same Congress that dealt with the fourteenth amendment when it was presented with the problems of the fifteenth amendment. With the fifteenth amendment, again Ohio reversed itself, this time by approving the amendment after first rejecting it. Cong.Globe, 41st Cong., 2d Sess. 110-111 (1869). New York, on the other hand, repudiated its earlier assent. Cong.Globe, 41st Cong., 2d Sess. 377 (1870). In discussing these developments on the floor of the Senate, Roscoe Conkling of New York took the position that a ratification was irrevocable but that a rejection had no legal effect whatsoever.
 
 Id.
 
 at 1477. Senator Davis of Kentucky argued that a vote by a state legislature either to reject or to ratify was final and conclusive.
 
 Id.
 
 at 1479.
 
 [52]
 
 Significantly, neither mentioned the adoption of the fourteenth amendment nor the resolution of Congress declaring it to be in effect. A resolution including Ohio and New York was introduced in Congress to proclaim the adoption of the amendment, but it died without vote.
 
 [53]
 
 The Secretary of State later proclaimed the adoption of the amendment by a certification that included Ohio and New York, the latter’s attempted withdrawal, however, was noted. This certification was not made, however, until two additional states had ratified, thus obviating the necessity of reliance on either Ohio or New York’s action.
 
 Id.
 
 at 2290. If the fourteenth amendment did resolve the question of rejection and rescission, it is surprising it was not referred to as a precedent in this situation.
 

 The lack of a definitive determination of the questions of rescission or rejection by Congress during the period following the fourteenth amendment was highlighted by the introduction of a bill that would make the attempted revocation of a state’s consent to an amendment null and void. Cong. Globe, 41st Cong., 2nd Sess. 28 (1869). Although the measure passed the House, Cong.Globe, 41st Cong., 2d Sess. 5356 (1870), the Senate Judiciary Committee reported it out adversely; and the bill died without further action. Cong.Globe, 41st Cong., 3rd Sess. 1381 (1871). Congressional action since the Civil War era has been equally indecisive.
 
 [54]
 

 From the foregoing it is plain that Congress has not come to any conclusion regarding the question of rescission. The fact that, congressional action could be viewed at best as equivocal would indicate that even
 
 *1139
 
 if the Court felt compelled to defer to a decision made by Congress, it would be impossible to do so. Therefore, the application of the political question limitation in this situation is not mandated by prudential considerations; furthermore, its application would be highly inappropriate in that it would work to further confusion in an area where stability should be considered a premium.
 

 The alternative ground advanced for following the
 
 Coleman
 
 holding on the nature of the question of the validity of a rejection is that analytically a rejection and a rescission should be treated the same, i.e., both “political questions,” since they are both but negative expressions of a state’s power to ratify. The Court is disinclined to accept this argument because the nature of the question of the effectiveness of a rescission of a prior ratification is essentially different from the question presented in
 
 Coleman
 
 as to the effect of a ratification after a prior rejection. Thus, it is appropriate to treat one as presenting a “political question” and the other as one proper for judicial declaration.
 

 To understand the Court’s view that different questions are presented by rescission and rejection which should not be treated the same, it is necessary to understand that this perception stems from the basic relationship between the states and Congress in the amending process and particularly in the procedure of determining whether or not there is sufficient consent to warrant the constitutional change. First, it is important to recognize that it is the state’s role to act as the voice of the people in expressing their consent to the proposed amendment. Second, it is also necessary to recognize that Congress under its power to determine whether there is a reasonably contemporaneous consensus acts in coordinating the local expressions of consent by considering them in light of the lapse of time and change of circumstances since the amendment was proposed. Because of this relationship, it is clear that Congress’ power to determine whether or not a state is part of the growing crescendo of consent does not come into play until the state has acted indicating that the people wish to be included as part of the consensus. And then Congress’ authority is limited to only the question of contemporaneousness of the expression of consent and does not extend to a continuous monitoring of the continued existence of actual local consensus. Instead, Congress is bound by the official certifications of the state on that matter. Thus, the question in
 
 Coleman
 
 as to the effectiveness of a ratification following a rejection is reasonably “political” if it is understood that what the Congress is deciding is not whether the ratification in truth overturned the state’s prior negative stance, clearly a matter beyond its authority to determine, but rather whether or not the ratification is within that reasonably contemporaneous time period so as to correspond with the other expressions of consent. If the state’s rejection rather than ratification correlates with the contemporaneous time period established by Congress, then the later ratification which is beyond the reasonably contemporaneous time period would be ineffective. This would be the Congress’ only grounds for finding a ratification after a rejection ineffective.
 

 A rescission, on the other hand, brings into play a different combination of responses which can best be understood by the following. In order to have a valid ratification of a proposed amendment, two elements must be found: (1) the state’s determination of consent, and (2) the congressional assessment of contemporaneousness. The various acts of a state in considering a proposed amendment bring into play various combinations of these two factors. A rejection indicates the state’s lack of consent and indefinitely bars the operation of Congress’ authority in the adoption process, because clearly there is nothing for Congress to coordinate with the other expressions of consent. A state’s certification of ratification expresses the existence of local consent and engages Congress’ power to determine the timing requirements of a contemporaneous expression of consent. A rescission of a prior ratification indicates a reassessment of the state’s expression of
 
 *1140
 
 consent, and by terminating its consent, it suspends the need for a congressional decision as to the contemporaneousness of the prior consent.
 
 [55]
 
 Thus, a state’s action in ratifying after a previous rejection would bring into play Congress’ role of determining whether or not the ratification is effective, which by its very nature takes into consideration factors that are uniquely political. A rescission, on the other hand, revokes the state’s assent to being included in the consensus suspending congressional or “political” inquiry.
 

 If the question of the effectiveness of a ratification after a rejection and the. effect of a rescission on a prior ratification are treated similarly as “political questions,” it would, in effect, mean that Congress would have control over ultimately assessing whether or not there is continued local consent. For example, if Congress could refuse to recognize a state’s rescission, it would mean that Congress would supplant the expression of the people’s representative with its own assessment of consent by holding that the prior expression of consent is still valid. Such a broad interpretation of congressional powers would destroy the balance created in article V and remove the state’s power to create a barrier to encroachment by the national government. Therefore, while it might be conceded that the effectiveness of a ratification in light of a prior rejection is proper for resolution by a political arm of government, the question of the effect of a rescission in light of a prior ratification does not bring into play the same type of considerations, and thus, because the questions posed by a rescission are not proper for consideration by the political branch, they should be treated differently.
 

 The application of the prudential consideration formulation of the “political question” doctrine to the procedural issues surrounding the problem of the constitutionality of the congressional extension of the ratification deadline is also not warranted. Nothing in the nature of the questions nor in the legislative history of the extension resolution is present which would convince the Court that the congressional enactment of the extension resolution is the type of determination by a political branch which the courts ought to unquestioningly adhere to.
 

 From the Court’s review of all the ramifications of the “political question” doctrine, there does not appear to be any compelling reasons for it to withhold its jurisdiction with regard to the questions presented. Furthermore, the Court is persuaded that both the questions of the efficacy of a rescission and the proper procedure for establishing a time period for ratification are the type of questions that must be interpreted with the kind of consistency that is characteristic of judicial rather than political decision making. Whatever the outcome of these questions as they relate to the powers vested by article V, they must be interpreted consistently for each amendment that may be proposed. The Court will now turn to a consideration of how these questions should be resolved.
 

 D.
 
 Rescission
 

 In addressing the question of whether or not a rescission of a prior ratification is a proper exercise of the state’s authority under article V to act on proposed amendments, it must be noted that whatever authority the states have is derived solely
 
 *1141
 
 from the Constitution itself.
 
 [56]
 
 The critical portion of article V that the Court must examine provides that an amendment becomes part of the Constitution “when ratified by the Legislatures of three-fourths of the several States, or by Conventions . .. . ” With reference to the phrase “when ratified”, commentators
 
 [57]
 
 and courts have explored a variety of interpretations to what can best be termed “subsequent acts,” i.e., the subsequent act of ratifying after a rejection or rescinding after a ratification. Three separate approaches have been postulated which are important to review in this Court’s consideration of the question of the state’s power to rescind.
 

 The first approach to be considered contends that whatever action is initially taken by the state, whether rejection or ratification, exhausts the state’s power under article V making any subsequent act to reverse the prior action a nullity. This approach was argued in
 
 Wise v. Chandler,
 
 270 Ky. 1, 108 S.W.2d 1024 (1937) before the highest state court of Kentucky and was defended on the grounds that the power of a state legislature to ratify cannot be any greater than its alternative, the state convention. Since a convention exhausts its authority by its initial action, whatever that action may be, it would be consistent to view a legislature as having only the same amount of authority. Advocates of this position also argue that treating both acceptance and rejection as conclusive would lend a consistency and concreteness to the system which would benefit an already difficult process. Furthermore, this approach would arguably be consistent with the notion that when a state acts under its power to ratify, it is not legislating but exercising a ministerial or constituent function. The
 
 Chandler
 
 case was appealed to the Supreme Court and the Court granted certiorari but dismissed the case because it determined that the issues presented were moot. Therefore, the Court did not approve or disapprove this approach.
 
 [58]
 

 The second approach postulated would condone only the act of ratification, and the negative expressions of rejection or rescission would be treated as a nullity. This approach was relied upon by the State Supreme Court of Kansas in adjudicating the issues in
 
 Coleman v. Miller,
 
 146 Kan. 390, 71 P.2d 518 (1937). This approach is premised on a literal reading of article V which speaks only of ratification. The argument follows that because the article does not confer upon the states the specific power to reject or rescind, but only to ratify, any of these negative acts cannot be recognized. Advocates of this position argue that greater efficiency would be given to the amendment process and lead to less confusion in that only positive acts would be counted towards final ratification. The United States Supreme Court had an opportunity to consider this approach when it reviewed the decision of the Kansas court. From the Supreme Court’s opinion in the
 
 Coleman
 
 matter it appears that this approach found little approval. In the “Opinion of the Court” Justice Hughes wrote that they found “no reason for disturbing the decision of the Supreme Court of Kansas ... its judgment is affirmed but upon
 
 the grounds stated in this opinion.” Coleman,
 
 307 U.S. at 456, 59 S.Ct. at 983 (emphasis added). Thus they rejected the approach of the Kansas court and chose to base their decision on other criteria.
 

 A third approach which has received support is that both the subsequent acts of ratification after a rejection and rescission after ratification should be recognized. Of course, one clear limitation is evident which is that any subsequent rescission after a prior ratification could not come after three-fourths of the states had ratified, for at that point the amendment automatically becomes part of the Constitution and a
 
 *1142
 
 state cannot withdraw its consent thereafter. This approach is grounded on the argument that it is illogical to impute more finality to ratification than to rejection, especially since the act of ratification itself has no binding effect until concurred in by the requisite three-fourths majority. Furthermore, this view is justified on the grounds that not allowing a withdrawal of approval might make an overly-cautious legislature hesitant to act, or bind an overly-zealous legislature to a position which upon mature reflection it does not support.
 

 From the approaches outlined above, in order to decide which should be controlling in the Court’s determination of the validity of a state’s rescission in light of its powers under article V, it is necessary to understand what a state is doing when it acts on a proposed amendment. First, it must be observed that the drafters of the Constitution considered it important that the power to change the Constitution must in some respect draw on that same power which is the source of the original authority of the Constitution — “the consent of the people.” The structure of article V indicates that it is the state that must ascertain the existence of local consent and reflect that sentiment when acting on an amendment. “[W]hen . . . [the requisite three fourths of the States are] united in the desire of a particular amendment, that amendment must infallibly take place.”
 
 Federalist Paper
 
 #
 
 85
 
 (Hamilton). All of the cases which have considered article V have reaffirmed the vision of the founding fathers that the essential democratic value of the will of the people be inextricably linked with the state’s action in considering ratification. For example, the Court in
 
 Hawke v. Smith, No. 1,
 
 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920), indicated that the role of ratification given to the states called for “action by deliberative assemblages representative of the people, which it was assumed would voice the will of the people.”
 
 Id.
 
 at 227, 40 S.Ct. at 497. The court went on to say that “ratification by a State of a constitutional amendment is not an act of legislation within the proper sense of the word. It is but the expression of the assent of the State to a proposed amendment.”
 
 Id.
 
 at 229, 40 S.Ct. at 498. The court in
 
 Dilion v. Gloss, supra,
 
 gave the state’s role in the ratification process a far more careful examination. They wrote:
 

 Thus the people of the United States, by whom the Constitution was ordained and established, have made it a condition to amending that instrument that the amendment be submitted to representative assemblies in the several States and be ratified in three-fourths of them. The plain meaning of this is (a) that
 
 all amendments must have the sanction of the people of the United States, the original fountain of power,
 
 acting through representative assemblies, and (b) that ratification by these assemblies in three-fourths of the States shall be taken as a
 
 decisive expression of the people’s will
 
 and be binding on all.
 

 Id.
 
 256 U.S. at 374, 41 S.Ct. at 512 (emphasis added).
 

 Thus, the essence of a state’s role in considering an amendment is to act as the mechanism whereby the will of the people is expressed.
 
 [59]
 

 Considering that an amendment cannot become part of the Constitution until a proper consensus of the people has been reached and it is the exclusive role of the states to determine what the local sentiment is, it logically follows that the subsequent act of rescission would promote the democratic ideal by giving a truer picture of the people’s will as of the time three-
 
 *1143
 
 fourths of the states have acted in affirming the amendment.
 
 [60]
 
 To allow a situation where either the first act of a state is irrevocable or where a rejection can be changed by a ratification, but not permit rescission, would permit an amendment to be ratified by a technicality — where clearly one is not intended — and not because there is really a considered consensus supporting the amendment which is the avowed purpose of the amendment procedure. Furthermore, an irrevocable ratification prior to the time that three-fourths have acted would completely disassociate the democratic notion of a considered consensus from the ratification procedure and create the very real possibility that an amendment could become part of the Constitution when the people have not been unified in their consent.
 

 The only apparent criticism of the approach which would recognize a rescission after a ratification is that to allow a change after a ratification would create confusion and uncertainty and essentially paralyze the process. This objection has little merit when it is realized that all Congress or its designate must do is count the state’s most recent official certification to determine whether or not three-fourths have ratified. In addition a brief review of amendatory history reveals that as a standard practice, questions regarding ratifications have usually been viewed in favor of disqualification and have caused little, if any, confusion. For example, in the process of ratifying the twelfth amendment, a question arose as to the validity of New Hampshire’s ratification.
 
 [61]
 
 If New Hampshire’s ratification would have been considered valid, they would have been the last state necessary for a three-fourths majority. Rather than proclaim the amendment part of the Constitution, the national government waited until another state ratified thus obviating the need for a resolution of the question. In the promulgation of the fifteenth amendment, two states changed their votes.
 
 [62]
 
 Resolutions were offered in Congress to resolve the questions of validity but the measures were buried in committee. The Secretary of State, who had the responsibility of counting the states’ ratifications, withheld proclaiming the amendment part of the Constitution until sufficient votes were received so that a declaration could be made without the need of counting the disputed ratifications. A similar approach was taken in the nineteenth amendment. Again, two states changed their votes and again additional votes were accumulated in order to promulgate the amendment.
 
 [63]
 
 Thus, uniformly where ratifications have been rescinded, the rescissions have been dignified by the national government by waiting and collecting additional ratifications to offset them. Parenthetically, no great confusion has been manifest.
 

 It seems clear from the statements of the founding fathers and from most courts in considering the amendment process that a ratification is linked to that great wellspring of legitimate constitutional power — the will of the people. The founding fathers were careful to make sure the Constitution was ratified by the consent of the people, and it follows that any amendment must again draw from that wellspring by securing a contemporaneous consensus before it can become a part of that original docu
 
 *1144
 
 ment. The states are the entity embodied with the power to speak for the people during the period in which the amendment is pending. To make a state’s ratification binding with no right to rescind would give ratification a technical significance which would be clearly inappropriate considering that the Constitution through article V gives technical significance to a state’s ratification at only one time — when three-fourths of the states have acted to ratify. Until the technical three-fourths has been reached, a rescission of a prior ratification is clearly a proper exercise of a state’s power granted by the article V phrase “when ratified” especially when that act would give a truer picture of local sentiment regarding the proposed amendment.
 

 Recognizing the validity of a state’s power to rescind its prior ratification, the defendant challenges Idaho’s rescission resolution arguing that it is procedurally faulty. Defendant maintains that in passing the House Concurrent Resolution 10, Idaho violated its own rules by adopting the resolution by less than the two-thirds majority used to ratify. Without elucidating on the defendant’s contentions, the Court would indicate that under the holding of
 
 Dyer v. Blair, supra,
 
 the “State legislatures . . . have the power and the discretion to determine for themselves how they should discharge the responsibilities committed to them by the federal government .... Moreover . . . there is no federal objection to the state legislatures’ independent determination of their own voting requirements.”
 
 Id.
 
 at 1307. Thus, the states have complete discretion over the procedural requirements regarding the requisite majorities to act under its article V powers. This would be true whether the state is exercising its affirmative power of ratification or the negative function of rescission. Furthermore, once the state legislature has forwarded an .official certificate of their action to Congress the notice is conclusive upon it and the courts as to both the truthfulness of the statements it contains and the propriety of the procedure by which it was promulgated.
 
 United States ex rel. Widenmann v. Colby,
 
 265 F. 998 (D.C.Ct. of App.1920);
 
 [64]
 

 Leser v. Garnett,
 
 258 U.S. 130, 137, 42 S.Ct. 217, 218, 66 L.Ed. 505 (1922);
 
 [65]
 

 Chandler v. Wise,
 
 307 U.S. 474, 59 S.Ct. 992, 83 L.Ed. 1407 (1939). Therefore, at this juncture it is not proper for the Court to review the procedure of the rescission resolution since proper certification has been made by the state to the national government.
 

 E.
 
 Extension
 

 The question of whether it is a proper exercise of congressional authority under article V to alter a previously proposed time limitation for ratification, and if so by what majority, presents for the Court a question of constitutional interpretation of congressional authority, and an inquiry into the procedural aspects of exercising that power. Thus, the Court’s inquiry is two-fold: First, does Congress under its power to “propose” the “Mode of Ratification” have the power to change its proposal once it has been made and sent to the states; second, if the initial proposal can be subsequently changed, may Congress act by less than a two-thirds majority. One related question
 
 *1145
 
 that has been raised that should be dealt with at this time is whether or not a state’s ratification resolution specifically acknowledging the ratification period set by Congress is impaired if the original time period is extended or whether it is a “conditional” ratification arguably prohibited by the amendment process.
 

 To begin with, the actions of Congress in relation to a proposed amendment must be properly characterized in order to approach the questions presented. First, it must be recognized that Congress’ power to participate in the amendment process stems solely from article V. As Justice Stevens noted, “the function of a state Legislature in ratifying a proposed amendment to the federal Constitution,
 
 like
 
 the function of Congress in proposing the amendment,
 
 is a federal function
 
 derived from the federal Constitution . . . . ”
 
 Dyer
 
 v.
 
 Blair,
 
 390 F.Supp. 1291, 1303 (N.D.Ill.1975) (emphasis added). Thus Congress, outside of the authority granted by article V, has no power to act with regard to an amendment, i.e., it does not retain any of its traditional authority vested in it by article I. The power of Congress to set a time period in which ratification must be completed is derived from their function of setting the mode of ratification.
 
 See Dillon v. Gloss,
 
 256 U.S. 368, 376, 41 S.Ct. 510, 513, 65 L.Ed. 994 (1921). The defendant in this action attempts to create a substance/procedure dichotomy by contending that since the time restriction in this instance is part of the proposing resolution it is proper for reconsideration where if the time period were part of the amendment itself it would not be. The argument follows that a change of a substantive aspect of an amendment is clearly improper once it has been submitted to the states, but a change in the proposing resolution, on the other hand, does not change the essential nature of the amendment and thus is a matter of detail which Congress can change at will. The Supreme Court in
 
 Dillon v. Gloss, supra,
 
 had an opportunity to address this substance/procedure dichotomy when the eighteenth amendment was challenged on the grounds that the seven-year ratification period called for in Section 3 of that amendment was unconstitutional. While the
 
 Dillon
 
 court indicated that “[a]n examination of article V discloses that it is intended to invest Congress with a wide range of power in proposing amendments”,
 
 Id.
 
 at 373, 41 S.Ct. at 512, the court did not recognize the setting of the time limitation as being a function of Congress’ power to propose amendments but instead indicated that
 

 [wjhether a definite period for ratification should be fixed so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine as an
 
 incident of its power to designate the mode of ratification.
 

 Id.
 
 at 376, 41 S.Ct. at 513 (emphasis added). The court did not recognize a substance/procedure dichotomy and thus any authority to limit the time period for consideration must flow from the Congress’ power to set the mode of ratification. Accordingly, the Court’s attention is drawn to a consideration of Congress’ power to set and change the time period for ratification under its power to set the mode of ratification.
 

 The United States Supreme Court in
 
 United States v. Sprague,
 
 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640 (1931) recognized that Congress has absolute discretion within its power to propose the mode of ratification to establish which of the two local entities will act as the spokesman for the people. The Supreme Court in the
 
 Dillon
 
 and
 
 Coleman
 
 cases found that as a “subsidiary matter of detail” to this congressional prerogative, Congress must also determine whether or not the local expressions of consent are “sufficiently contemporaneous in that number of States to reflect the will of the people in all sections at relatively the same period . .. . ”
 
 Dillon
 
 256 U.S. at 375, 41 S.Ct. at 512. In making its determination that the requisite consensus has been reached in a sufficiently contemporaneous period, the Supreme Court in
 
 Coleman, supra,
 
 indicated that if no time restriction is set initially, Congress retains its authority
 
 *1146
 
 to decide that issue when the requisite number of states have acted.
 

 Our decision that the Congress has the power under Article V to fix a reasonable limit of time for ratification in proposing an amendment proceeds upon the assumption that the question, what is a reasonable time, lies within the congressional province. If it be deemed that such a question is an open one when the limit has not been fixed in advance, we think that it should also be regarded as an open one for the consideration of the Congress when, in the presence of certified ratifications by three-fourths of the States, the time arrives for the promulgation of the adoption of the amendment. The decision by the Congress, in its control of the action of the Secretary of State, of the question whether the amendment had been adopted within a reasonable time would not be subject to review by the courts.
 

 Id.
 
 307 U.S. at 454, 59 S.Ct. at 982. The court in
 
 Dillon
 
 further clarified the scope of Congress’ power by indicating that while Congress is not compelled to make a determination of a reasonable time period in advance of the actions of the requisite number of states, it is not precluded from doing so. The
 
 Dillon
 
 court held that Congress may fix a reasonable time in advance “so that all may know what it is and speculation ... be avoided.”
 
 Id.
 
 256 U.S. at 376, 41 S.Ct. at 513. It should be noted that the
 
 Dillon
 
 court did not intimate that the setting of a definite time period was a projection or preliminary assessment of a reasonable time period which would be reevaluated as time passed. Rather, the Court indicated that the exercise of Congress’ power to set a time period for ratification is one which is intended to infuse certainty into an area which is inherently vague. Thus the inference that can be drawn from
 
 Dillon
 
 and
 
 Coleman
 
 is that within Congress’ role of determining a reasonably contemporaneous consensus, or in other words, determining whether the socio/political, economic forces giving rise to the amendment remain alive and unchanged during the period in which the states act in giving their assent to the proposal, Congress may exercise its function in one of two ways: first, it can leave the question of a reasonable time open until the requisite number of states have acted and thus continually monitor the viability of the amendment; second, where it appears to Congress that the socio/political, economic factors giving rise to the amendment are such that they are unlikely to change for an indefinite period of time, and rather than have the proposed amendment pending perpetually, Congress can set an arbitrary yet reasonable time period in order to establish a termination point for consideration and thus promote prompt action on the amendment by the states.
 
 [66]
 

 It, therefore, appears compelling that in order to fulfill the purposes for fixing a time limitation for ratification as outlined in
 
 Dillon
 
 — “so all may know and speculation ... be avoided” — the congressional determination of a reasonable period once made and' proposed to the states cannot be altered. If Congress determines that a particular amendment requires ongoing assessment as to its viability or monitoring of the time period, it can do so, not by defeating the certainty implied by the
 
 Dillon
 
 case, but by not setting a time period at the outset and reserving the question until three-fourths of the states have acted.
 

 The Court’s conclusion that Congress cannot change the ratification period once it is set also finds support from the form in which it is presented to the states. While the setting of a time period for ratification has been described as a “subsidiary matter of detail,” pursuant to Congress’ power to propose the mode of ratification, if the Congress chooses to fix a time period by making it part of its proposal to the states, that determination of a time period becomes an
 
 *1147
 
 integral part of the proposed mode of ratification. Once the proposal has been formulated and sent to the states, the time period could not be changed any more than the entity designated to ratify could be changed from the state legislature to a state convention or vice versa. Once the proposal is made, Congress is not at liberty to change it.
 

 In any event, while the general power of Congress to change its prior proposal may be argued, it is more than clear that in this instance Congress’ promulgation of the extension resolution was in violation of the constitutional requirement that Congress act by two-thirds of both Houses when exercising its article V powers. Since Congress can act only within the authority given it by article V, and in none other, when proposing amendments or the mode of ratification, arguments relating to acceptable parliamentary order or procedure have little bearing in determining what voting requirement is necessary for Congress to alter a proposed time limitation on ratification. This is because such an argument presumes Congress is functioning in a legislative capacity when exercising its powers under article V. To determine in what manner Congress must act in utilizing its authority under article V, reference must first be made to the Constitution itself. If it is silent, then the courts can leave Congress to decide its own procedural requirements.
 
 See Dyer v. Blair,
 
 390 F.Supp. 1291 (N.D.Ill.1975). Article V grants Congress only one power which can be exercised with regard to two separate considerations. Congress has the power to “propose.” It can “propose” the text of the amendment and it can “propose” the mode of ratification. When acting in its function of proposing the amendment itself, article V has given the term “Congress” a particular definition. Article V states, “The Congress,
 
 whenever two thirds of both Houses shall deem
 
 it
 
 necessary,
 
 shall propose Amendments . . . . ” U.S.Const., Art. V (emphasis added). Within its powers to propose the mode of ratification, however, no specific reference is made by what concurrence of both Houses, or even if both Houses must act, in order for the mode of ratification to be proposed and sent to the states. Article V only provides that ratification be “by the legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be
 
 proposed by Congress
 
 . . . . ” U.S.Const., art. V (emphasis added). The defendant argues that this failure of the drafters to designate by what majority the power to propose the mode of ratification indicates that it should be left to Congress to set its own procedure. But this argument overlooks the fact that the word “Congress” has been specifically defined earlier in the same sentence. Rather than give the word “Congress” two different meanings within the same provision, it seems more logical to give it a consistent interpretation throughout. This conclusion seems even more reasonable when it is considered that what is being dealt with is the same power — the congressional power to “propose.”
 

 One final observation. Reviewing several of the most recent resolutions proposing amendments to the Constitution and referring particularly to the resolution proposing the Equal Rights Amendment, the mode of ratification has been proposed by the approval of two-thirds of both Houses of Congress, thus indicating by general practice that this is the appropriate measure of approval.
 

 Therefore, the Court is persuaded that the congressional act of extending the time period for ratification was an improper exercise of Congress’ authority under article V. While Congress is not required to set a time period in advance of the requisite number of states acting to ratify, if it chooses to do so to remove uncertainty regarding the question, it cannot thereafter remove that certainty by changing the time period. In addition, since it is clear that Congress must act by a two-thirds concurrence of both Houses when acting pursuant to its authority under article V, and because the extension resolution was enacted by only a simple majority, the extension resolution is an unconstitutional exercise of congressional authority under article V.
 

 
 *1148
 
 Since the Court has determined that the enactment of the extension resolution was an
 
 ultra vires
 
 act, and thus unconstitutional, the question of the effect of the extension on a state’s alleged “conditional” ratification is one that the Court does not need to address. However, the Court would point out the irony of the defendant’s position in arguing that a state cannot condition its ratification and then contend that the condition can be purged from the ratification leaving the state’s adoption of the amendment intact. If the defendant truly maintains that a ratification cannot be conditioned, then it would seem consistent that conditional ratification must be considered a nullity. If a state has acted improperly in exercising its ratification powers, only the states can cure the impropriety and neither Congress nor the courts can exorcise the statements of condition from the ratification. It must either succeed or fail as it is enacted.
 

 F.
 
 Mandatory Injunction
 

 To begin with, several observations are appropriate. First, the relief the plaintiffs seek is a mandatory injunction.
 
 [67]
 
 Relief in the form of mandamus, it is conceded, is not appropriate in this action. Second, it is well settled that the injunction remedy is a power given the courts under their equitable jurisdiction. Thus the courts’ granting or denying of an injunction in a particular case is governed by those fundamental and established principles by which courts of equity are guided and influenced in their judicial action and in administration of relief.
 
 Singleton v. Anson County Board of Education,
 
 283 F.Supp. 895 (W.D.N.C.1968). It is also clear that a mandatory injunction is viewed as an exceptional remedy and thus not regarded with judicial favor.
 
 Black v. Jackson,
 
 177 U.S. 349, 20 S.Ct. 648, 44 L.Ed. 801 (1900);
 
 Singleton v. Anson County Board of Education, supra.
 
 If the Court finds that its application is called for, it should be used with caution and only in cases of great necessity.
 
 Id.
 

 From the rulings that this Court has made on the questions of the validity of Idaho’s rescission and the constitutionality of the extension, it appears that these declarations alone are enough to settle all disputes between the parties. Since the Court has found the rescission of Idaho’s prior ratification to be valid and the congressional act of extension unconstitutional, little would be served in granting the plaintiffs’ request for an order directing the Administrator of the General Services to return Idaho’s ratification papers, and barring him from accepting further ratifications. Therefore, the Court will deny the plaintiffs’ request for this extraordinary relief.
 

 In summary, the Idaho plaintiffs have standing to bring this action. The matter is ripe for determination and the Court has jurisdiction and properly should determine the issues presented.
 

 The clear purpose of article V of the United States Constitution is to provide that an amendment properly proposed by Congress should become effective when three-fourths of the states, at the same time and within a contemporaneous period, approve the amendment by ratification through their state legislatures.
 

 To allow an amendment to become effective at any time without the contemporaneous approval of three-fourths of the states would be a clear violation of article V of the Constitution. It follows, therefore, that a rescission of a prior ratification must be recognized if it occurs prior to unrescinded ratification by three-fourths of the states. Congress has no power to determine the validity or invalidity of a properly certified ratification or rescission.
 

 Congress, when acting as an amending body under article V, may, by two-thirds vote of both Houses, propose an amendment and the mode of ratification. Congress has no power to propose either an amendment or a mode of ratification except by a two-thirds vote of both Houses.
 

 
 *1149
 
 As part of the mode of ratification, Congress may by a two-thirds vote of both Houses set a reasonable time limit for the states to act in order for the ratification to be effective. When this time is set, it is binding on Congress and the states and it cannot be changed by Congress thereafter.
 

 Accordingly, the Court declares that Idaho’s rescission of its ratification of the twenty-seventh amendment effectively nullified its prior ratification and Idaho may not be counted as a ratifying state. The same is true for any other state which has properly certified its action of rescission to the Administrator of the General Services.
 

 The Court further declares that the majority action of Congress in attempting to extend the period for ratification of the twenty-seventh amendment is void and of no effect.
 

 In view of the Court’s declarations, it appears that the injunctive relief sought by plaintiffs is unnecessary and the same is denied.
 

 ORDER
 

 This matter having come on before the Court and the Court having heard the arguments of counsel and the matter having been submitted on the briefs, and the Court being fully advised in the premises and having filed its memorandum decision herein;
 

 NOW, THEREFORE, IT IS ORDERED that the defendant’s and defendant-intervenors’ motion to dismiss or in the alternative for summary judgment be, and the same is hereby, DENIED.
 

 IT IS FURTHER ORDERED, and the Court finds, that the plaintiffs’ request for declaratory judgment should be GRANTED, and the Court declares that a state has the power and right to rescind a prior ratification of a proposed constitutional amendment at any time prior to the unrescinded ratification by three-fourths of the states of the United States properly certified to the General Services Administration; and declares that the ratification by Idaho of the twenty-seventh amendment was properly rescinded and such prior ratification is void, as is the ratification of any other state that has properly rescinded its ratification. The Court further declares that Congress’ attempted extension of the time for the ratification of the twenty-seventh amendment was null and void.
 

 IT IS FURTHER ORDERED that in light of the Court’s declarations, it finds it unnecessary to grant the plaintiffs’ requested injunctive relief and therefore will deny the same.
 

 [1]
 

 . § 106b.
 
 Amendments to Constitution
 

 Whenever official notice is received at the General Services Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Administrator of General Services shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to ail intents and purposes, as a part of the Constitution of the United States. Added Oct. 31, 1951, c. 655, § 2(b), 65 Stat. 710.
 

 [2]
 

 . Nebraska ratified the Equal Rights Amendment on March 29, 1972, and rescinded it on March 15, 1973; Tennessee ratified on April 4, 1972, and rescinded April 23, 1974; Idaho ratified on March 24, 1972, and rescinded February 9, 1977; Kentucky ratified on June 26, 1972, and rescinded on March 17, 1978, but the rescission resolution was subsequently vetoed by the state lieutenant governor while the governor was absent from the state.
 

 [3]
 

 . H.R.J.Res. 638 passed the House August 15, 1978, 124 Cong.Rec. H8,664-65 (daily ed. Aug. 15, 1978). It passed the Senate October 6, 1978, 124 Cong.Rec. S17,318-19 (daily ed. Oct. 6, 1978).
 

 [4]
 

 .
 
 See
 
 Exhibit E to plaintiffs’ complaint.
 

 [5]
 

 . IN THE HOUSE OF REPRESENTATIVES
 

 HOUSE CONCURRENT RESOLUTION NO. 10
 

 BY STATE AFFAIRS COMMITTEE A CONCURRENT RESOLUTION REPEALING RATIFICATION OF A PROPOSED AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA.
 

 Be It Resolved by the Legislature of the State of Idaho:
 

 WHEREAS, the Ninety-second Congress of the United States of America, at its second session, in both houses, by a constitutional majority of two-thirds thereof, adopted the following proposition to amend the Constitution of the United States of America, in the following words, to-wit:
 

 JOINT RESOLUTION
 

 “RESOLVED BY THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED STATES OF AMERICA IN CON
 
 *1108
 
 GRESS ASSEMBLED (TWO-THIRDS OF EACH HOUSE CONCURRING THEREIN), that the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:
 

 ARTICLE—
 

 “ ‘SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
 

 “SECTION 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
 

 “SECTION 3. This amendment shall take effect two years after the date of ratification,’ ” and
 

 WHEREAS, the Forty-first Legislature of the State of Idaho approved Senate Joint Resolution No. 133, relating to the ratification of said congressional resolution and proposed amendment.
 

 NOW, THEREFORE, BE IT RESOLVED by the First Regular Session of the Forty-fourth Idaho Legislature, the House of Representatives and the Senate concurring therein;
 

 1. That Senate Joint Resolution No. 133 of the Second Regular Session of the Forty-first Idaho Legislature, in support of the aforesaid proposed amendment to the Constitution of the United States of America, and the action of the Idaho State Legislature ratifying said amendment, be rescinded, voided, repealed, withdrawn, recalled, and disaffirmed.
 

 2. That copies of this Resolution, duly certified by the Secretary of State, with the Great Seal of the State of Idaho attached thereto, be forwarded by the Secretary of State to the Administrator of General Services, Washington, D.C., and to the President of the Senate and the Speaker of the House of Representatives of the Congress of the United States of America.
 

 [6]
 

 .
 
 Id
 

 [7]
 

 . See
 
 Exhibit B to plaintiffs’ complaint.
 

 [8]
 

 .
 
 Claude L. Oliver et al v. Dixy Lee Ray et al,
 
 Civil No. C79 140T (W.D.Wash. 1979).
 

 [12]
 

 .
 
 Id.
 

 [9]
 

 . The full text of article V is as follows:
 

 ARTICLE V.
 

 The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.
 

 [10]
 

 . A proper framing and understanding of the issues presented in this case cannot be taken lightly. In order to properly evaluate the issues presented here, it must be remembered that substantive aspects of the Equal Rights Amendment are not now at issue. The Court will follow the injunction of the Supreme Court in
 
 McCulloch v. Maryland,
 
 4 Wheat 316, 4 L.Ed. 579 (1819), “In considering th[ese] question[s], then, we must never forget that it is a
 
 constitution
 
 we are expounding.” (emphasis in original).
 

 [11]
 

 . What Justice Powell has said about standing is true of justiciability in general:
 

 [the] inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise .... In both dimensions it is founded in concern about the proper — and properly limited — role of the courts in a democratic society.
 
 See Schiesinger v. Reservists to Stop the War,
 
 
 *1110
 
 418 U.S. 208, 221-227, 94 S.Ct. 2925, 2932 - 35, 41 L.Ed.2d 706 (1974);
 
 United States v. Richardson,
 
 418 U.S. 166, 188-197, 94 S.Ct. 2940, 2952-56, 41 L,Ed.2d 678 (1974) (Powell, J., concurring).
 

 Warth v. Seldin,
 
 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).
 

 [13]
 

 . The Ninth Circuit has recently considered what would suffice to establish a threat of injury to grant a plaintiff standing. In
 
 Seattle School Dist. No. 1 v. State of Wash.,
 
 633 F.2d 1338 (9th Cir. 1980), the defendant moved to dismiss as to one of the plaintiff school districts because the state had not threatened that particular district with enforcement of the statute that was being challenged in the suit. The circuit court ruled that it is not always necessary that there be a direct threat of injury “if the circumstances of the dispute provide sufficient guarantees that a genuine case or controversy exists . . .
 
 Id.
 
 at 1342 n.l. Accepting this formulation of the standing question, the case brought before the Court by these plain
 
 *1112
 
 tiffs is clearly sufficient to meet the case or controversy requirements and thus standing would be appropriate for these plaintiffs.
 

 [14]
 

 . Seven of the individual plaintiffs in this action, as members of the Idaho legislature voted in favor of the proposed amendment, viz Reed W. Budge, Walter H. Yarbrough, Ernest A. Hale, Melvin F. Hammond, Jack C. Kennevick, Walter F. Little, W. Israel Merrill.
 

 [15]
 

 . Seventeen of the individual plaintiffs in this action, as members of the Idaho legislature, voted in favor of the rescission resolution, viz Rusty M. Barlow, Noy E. Brackett, Ernest A. Hale, Melvin F. Hammond, Gordon R. Hollifield, Ray E. Infanger, Gary J. Ingram, Jack E. Kennevick, Walter E. Little, Ralph Olmstead, Tom W. Stivers, Wayne E. Tibbitts, Reed W. Budge, W. Israel Merrill, James E. Risch, J. Wilson Steen, and Walter H. Yarbrough.
 

 [16]
 

 .
 
 See, e.g., McClure v. Carter,
 
 513 F.Supp. 265 (1981).
 

 [17]
 

 . See
 
 Coleman v. Miller,
 
 307 U.S. 433, 473, 59 S.Ct. 972, 991, 83 L.Ed. 1385 (1939), “Chronology of Child Labor Amendment.”
 

 [18]
 

 . S. 3418, 91st Cong., 2d Sess. (1970).
 

 [19]
 

 . For full text see footnote 1,
 
 supra.
 

 [20]
 

 . The first
 
 Dyer v. Blair,
 
 390 F.Supp. 1287 (N.D.Ill.E.D., 1974) was dismissed because the issues were not ripe because the legislature of Illinois had not completed action on the amendment. Until full legislative action had been completed, a challenge to its procedure could not be entertained. When full consideration had been completed, however, the issues were heard,
 
 Dyer v. Blair,
 
 390 F.Supp. 1291 (N.D.Ill. 1975), thus making it clear that not all issues relating to the amendment process remain unripe until three-fourths of the states have acted.
 

 [21]
 

 . It has been argued by the plaintiffs that the “political question” doctrine does not apply in this case because the questions presented here do not bring into play separation of powers considerations but rather deal with the problem of “federalism,” i.e., the balance of authority between the states and the federal government. This argument is ill-conceived for two reasons. First, it overlooks the preliminary question of who should address the issues, the courts or Congress — clearly a question of separation of powers. Second, the argument misperceives the nature of the amending process. The courts have long held that when acting pursuant to its authority under article V, the states are not performing a traditional state function but instead a federal function.
 
 Hawke
 
 v.
 
 Smith, No. 1,
 
 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920). Similarly, when Congress acts pursuant to its authority under article V, it is acting in a special nontraditional federal function.
 
 Hollingsworth v. Virginia,
 
 3 U.S. 3 Dall 378, 1 L.Ed. 644 (1798). Thus, since both are in essence federal entities, a question of federalism would not be presented. Instead, the questions present problems of constitutional interpretation.
 

 [22]
 

 . A phrase coined by Professor Bickel to describe the operation of the “political question” doctrine. Bickel, The Least Dangerous Branch (1962).
 

 [23]
 

 . The
 
 National Prohibition Cases,
 
 253 U.S. 350, 40 S.Ct. 486, 64 L.Ed. 946 (1920) considered this portion of article V. This case established the principle that “two-thirds of both Houses” could be two-thirds of a congressional quorum rather than the full membership of each House. Furthermore, this case determined that the mere act of Congress proposing an amendment'is sufficient to indicate that it is “deem[ed] . . . necessary.”
 
 Id.
 
 at 386. Finally, the court decided that the term “amendment” includes additions to the Constitution rather than mere changes in matters already present in the Constitution.
 
 Id.
 

 [24]
 

 . In
 
 Dillon v. Gloss,
 
 256 U.S. 368, 41 S.Ct. 510, 65 L.Ed. 994 (1921) the Supreme Court considered- this language and determined that an amendment becomes part of the Constitution as of the date of the ratification of the last state necessary for three-fourths, instead of the time of its promulgation by the Secretary of State of the Administrator of General Services.
 

 [25]
 

 .
 
 Dyer v. Blair,
 
 390 F.Supp. 1287 (N.D.M.E.D., 1974). A three-judge district court interpreted the word “ratified” and determined that “article V delegates to state legislatures — or the state convention depending on the mode of ratification selected by Congress — the power to determine their own voting requirements.”
 
 Id.
 
 at 1308.
 

 [26]
 

 . In
 
 Hawke v. Smith, No. 1,
 
 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920), the court held that a provision in a state constitution allowing legislation to be approved by referendum was inapplicable to ratification of a constitutional amendment because ratification is not an ordinary legislative act. In reaching this decision the court based its decision on its interpretation of the word “legislature” as found in article V.
 
 Id.
 
 at 228-9, 40 S.Ct. at 497-98.
 

 [27]
 

 . In
 
 United States v. Sprague,
 
 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640 (1931) the court considered this phrase in deciding that Congress had complete discretion in determining which entity could act to ratify a proposed amendment.
 
 Id.
 
 at 730, 51 S.Ct. at 221.
 

 [28]
 

 . See footnote 47 and accompanying text.
 

 [29]
 

 . See Chapter V pp. 127-168.
 

 [30]
 

 . “The first written charters or constitutions providing for their amendment appear to have been the charters of the Colony of Pennsylvania, which was the only colony to make such provision. .Eight of the state constitutions during the period between the declaration of independence and the meeting of the Constitutional Convention of 1787 contained amendment clauses.” Orfield, The Amending of the Federal Constitution, 1 (footnotes omitted).
 

 [31]
 

 . See
 
 Federalist Paper #22
 
 (Hamilton).
 

 [32]
 

 . For example, James Madison wrote:
 

 The truth is, that the great principles of the Constitution proposed by the convention may be considered less as absolutely new, than as the expansion of principles which are found in the articles of Confederation. The misfortune under the latter system has been, that these principles are so feeble and confined as to justify all the charges of inefficiency which have been urged against it, and to require a degree of enlargement which gives to the new system the aspect of an entire transformation of the old.
 

 Federalist Paper #40.
 
 '
 

 [33]
 

 . The Virginia (Randolf) and New Jersey (Pinckney) Plans, together with Hamilton’s Plan, are available in Document of American History 134-8 (5th ed. Commanger 1949); Far-rand, The Framing of the Constitution of the United States, 87-9, 225-32 (1913); Drafting the Federal Constitution, 46-90 (Prescott ed. 1941).
 

 [34]
 

 . Madison,
 
 Journal of the Federal Constitution,
 
 63 (Scott ed. 1898).
 

 [35]
 

 . When the proposition was taken up for discussion on June 5, Madison recorded that “Mr. Gerry favored it,” since “the novelty and difficulty of the experiment,” to Gerry’s mind, required “periodic revisions,” the prospect of which “would also give intermediate stability to the government,” for “nothing had yet happened in the States where this provision existed to prove its impropriety.” Madison,
 
 supra,
 
 note 34 at 110.
 

 [36]
 

 . Madison reports that Mason defended the proposal believing the plan adopted by the Convention would “certainly be defective, as the Confederation has been found on trial to be,” Therefore he thought the amendments would be necessary and it would “be better to provide for them in an easy, regular and constitutional way, than to trust to chance and violence. It would be improper to require the consent of the National legislature, because they may abuse their power, and refuse their assent on that very account.” Madison,
 
 supra,
 
 note 34 at 149.
 

 [37]
 

 . Madison,
 
 supra,
 
 note 34 at 72.
 

 [38]
 

 . Elliot, Debates on the Adoption of the Federal Constitution 2d ed., 127-28 (1937 facsimile of 1836 ed.).
 

 [39]
 

 . Madison,
 
 supra,
 
 note 34 at 692-3.
 

 [40]
 

 . The Supreme Court confirmed this fact in
 
 United States v. Sprague,
 
 282 U.S. 716, 732, 51 S.ct. 220, 222, 75 L.Ed. 640 (1931).
 

 [41]
 

 . To illustrate why this determination is essential consideration should be given to the relationship of who proposes the amendment and who ratifies. If the states, through their legislatures, apply for a convention to propose amendments to the Constitution, and by that method succeed in proposing an amendment, Congress then has the clear option of deciding whether, to submit the matter for ratification to the state legislatures, who in essence proposed the measure, or an alternative local group which might better reflect the local sentiment. If Congress proposes the amendment, there does not appear to be any particular reason why one entity should be preferred above another. But then again, the legislative history of the twenty-first amendment should be given careful scrutiny.
 

 [42]
 

 .
 
 Federalist Paper ‡‡ 78
 
 (Hamilton).
 

 [43]
 

 .
 
 United States v. Nixon,
 
 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974), quoting
 
 Marbury v. Madison,
 
 1 Cranch 137, 177, 2 L.Ed. 60 (1803).
 

 [44]
 

 . While it appears clear that the reasonableness of the time period set by Congress is exclusively within its control and barred from judicial review by the “political question” doctrine, the defendant has conceded that the “political question” bar is not as absolute as initially indicated. In oral argument before the Court the following answer was given to the Court’s inquiry:
 

 THE COURT: Let me ask you one other question. I recognize the argument in the political question, and it is a very serious question, but somewhere down the line, I assume that if Congress got too far out of line on what was a contemporaneous approval, the Court would move in. Do you disagree with that?
 

 MR. LINDER [defendant’s attorney]: No, Your Honor. In terms of the hypothetical, I do not disagree with that.
 

 THE COURT: Your position is, this is within a reasonable area and they first would make their decision before the Court becomes involved?
 

 MR. LINDER: That is correct.
 

 Therefore, at some point the courts could review a determination by Congress and theoretically overrule its finding of what constitutes a reasonable time period. Such a position undoubtedly compromises the application of the “political question” doctrine where the time period is in issue.
 
 Compare Dillon v. Gloss,
 
 256 U.S. 368, 376, 41 S.Ct. 510, 513, 65 L.Ed. 994 (1921).
 

 [45]
 

 . Professor Orfield has indicated in his treatise:
 

 If the Constitution made specific provision for the submission of the question of the validity of amendments to a designated tribunal, it might perhaps be asserted that their validity is not a question for the ordinary courts, though even in that case the exclusion of the courts has been doubted. Article Five, however, is silent, so that there is much reason to. assert that the validity of amendments, like so many other controversies which may arise over the interpretation of the Constitution, is a legal question. The theory of the courts in claiming the power to adjudicate amendments is doubtless the same as that back of the power to declare laws unconstitutional. The Supreme Court may set aside any unconstitutional act of Congress or of the President, and reverse its own and the decisions of the lower courts where the interpretation was erroneous. From this it follows that where there is a failure to comply with the regular mode of amendment prescribed in Article V, the courts may regard the procedure as null and void.
 

 Orfield,
 
 supra
 
 note 30 at 13-14 (footnotes omitted).
 

 [46]
 

 . Justice Rehnquist quoted the following section from
 
 Coleman:
 

 We think that . .. the question of the efficacy of ratifications by state legislatures, in the light of previous rejection or attempted withdrawal, should be regarded as a political question pertaining to the political departments, with the ultimate authority in the Congress in the exercise of its control over the promulgation of the adoption of the Amendment.
 

 The precise question as now raised is whether, when the legislature of the State, as we have found, has actually ratified the proposed amendment, the Court should restrain the state officers from certifying the ratification to the Secretary of State, because of an earlier rejection, and thus prevent the question from coming before the political departments. We find no basis in either Constitution or statute for such judicial action. Article V, speaking solely of ratification, contains no provision as to rejection ....
 

 Goldwater v. Carter,
 
 444 U.S. 996, 1002-3, 100 S.Ct. 533, 537, 62 L.Ed.2d 428 (1979), and indicated that it was this part of the opinion that served as the basis for his claim that
 
 Goldwater
 
 was analogous to
 
 Coleman,
 
 i.e., termination like rejection was not mentioned in the Constitution. But for analytic purposes, Justice Rehnquist did not continue to use the rejection discussion found in
 
 Coleman
 
 as a basis for his holding in
 
 Goldwater,
 
 but instead shifted to Justice Hughes’ discussion of the question of lapse of time and his determination that no justiciable standard existed to direct the courts to a decision on that issue. This is evident from the fact that the reason the
 
 Coleman
 
 court found the question of the efficacy of a ratification in light of a previous withdrawal was excluded by ellipsis. For example, the first paragraph cited by Justice Rehnquist should have read:
 

 We think that
 
 in accordance with this historic precedent
 
 the question of the efficacy of ratifications by state legislatures, in the light of previous rejection or attempted withdrawal, should be regarded as a political question pertaining to the political departments, with the ultimate authority in the Congress in the exercise of its control over the promulgation of the adoption of the amendment.
 

 Coleman v. Miller,
 
 307 U.S. 433, 450, 59 S.Ct. 972, 980, 83 L.Ed. 1385 (1939). Thus making it clear that the rejection issue was not decided on the grounds that a judicial standard was lacking but rather that historical precedent dictated the determination that it was a political question. While concededly
 
 Coleman
 
 and
 
 Goldwater
 
 are factually analogous, it is clear that analytically they were handled differently. Therefore, for a proper understanding of the holding in
 
 Goldwater, Dyer v. Blair,
 
 390 F.Supp. 1291 (N.D.Ill.1975) should be scrutinized.
 

 [47]
 

 . There is a constitutional interest in the stability that the courts can provide. The purpose of the framers in including article V can only have been to provide for the orderly alteration of the Constitution to ensure its responsiveness for future generations. It is anomalous that a strictly construed political question doctrine might become the instrument for the disorder that would ensue from congressional reversals of its own precedent. Professor Orfield has noted:
 

 From the point of view of orderly amending procedure it is doubtful that the doctrine of political question should be extended to other procedural steps. If orderly procedure is essential in the enactment of ordinary statutes, should it not be even more so as to the adoption of important and permanent constitutional amendments? Such orderly procedure might call for compliance with certain fundamental prerequisites without emphasizing small details.
 

 Orfield,
 
 supra,
 
 note 30 at 21.
 

 [48]
 

 . Orfield,
 
 supra,
 
 note 30 at 20.
 

 [49]
 

 . “[Based] on the most familiar and fundamental principles, so obvious as rarely to be stated ... no Congress has the power to bind the consciences of its successors, with respect to grave questions of constitutional law . . . . ” Black,
 
 Amending the Constitution,
 
 82 Yale L.J. 189, 191-92 (1972).
 

 [50]
 

 . See Mr. Justice Butler and Mr. Justice McReynolds’ dissent.
 
 Coleman v. Miller,
 
 307 U.S. 433, 470, 59 S.Ct. 972, 989, 83 L.Ed. 1385 (1939).
 

 [51]
 

 . The Congress was well aware of Georgia’s ratification before action was taken on Secretary Sewards’ certification. The contents of Georgia’s ratification were received by the House by telegram and read on the floor.
 

 [52]
 

 . “Both Conkling and Davis argued from the premise that ratification by a state legislature had the same effect as would ratification by a convention in case that method were chosen by Congress. Both assumed that ratification by a convention would be final. Davis made the further assumption that rejection by a convention would exhaust the power of a state to act on an amendment.
 

 Note,
 
 The Constitutional Law of Constitutional Amendments,
 
 26 Notre Dame Lawyer 185, 205 n.70 (1951).
 

 [53]
 

 . The resolution of promulgation read much the same as the resolution adopted by the 40th Congress to promulgate the fourteenth amendment, but Congress refused to act on it. Cong. Globe, 41st Cong., 2d Sess. 1444, 2738, 3142 (1870).
 

 [54]
 

 . For example, the following acts have been initiated in Congress: S.2307, 90th Cong., 1st Sess. (1967); S.623, 91st Cong. 1st Sess. (1969); S.215, 92nd Cong., 1st Sess. (1971); S.1271, 93rd Cong., 1st Sess. (1973), most would confirm the state’s right to rescind but none have received enough support to be enacted as law.
 

 [55]
 

 . An obvious reason that the congressional power to determine contemporaneousness is suspended is that there is no longer a statement of consent by the state to be associated with the other local expressions of consent. Also, it is eminently clear that Congress cannot nullify a state’s rescission under the powers it is given by article V. Looking at the essential question Congress must consider in exercising its article V authority of determining a contemporaneous consensus, it is evident that to nullify a state’s action on an amendment, Congress must determine that the basic socia/economic, political milieu has so changed that the state’s action cannot be said to relate with the other expressions of consent. Such a determination, however, would mean that the amendment is no longer viable, thus terminating all states’ actions with regard to the amendment.
 

 [56]
 

 . See footnote 21,
 
 supra.
 

 [57]
 

 . See generally Orfield,
 
 supra,
 
 note 30 at 70-73 and the accompanying authority.
 

 [58]
 

 . It can be persuasively argued that the court’s ruling in
 
 Coleman v. Miller,
 
 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) effectively does away with the one-shot approach by at least tacitly indicating that a state might be able to ratify after a prior rejection.
 

 [59]
 

 . It could be argued that if true democratic consensus is the goal of the amendment process then the people should act directly on an amendment by way of referendum. But the courts have directly addressed this question and indicated that while a consensus of the people is the goal of the amendment process, article V speaks only of state legislatures or state conventions. Thus it is only through the media of one of these state entities that the will of the people can be expressed.
 
 Kimble v. Swackhamer,
 
 439 U.S. 1385, 99 S.Ct. 51, 58 L.Ed.2d 225 (1978);
 
 Hawke v. Smith, No. 1,
 
 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920);
 
 cf. Trombetta v. State of Florida,
 
 353 F.Supp. 575 (M.D.Fla.1973).
 

 [60]
 

 . Orfield,
 
 supra,
 
 note 30 at 72.
 

 [61]
 

 . The question that arose was regarding the actions of the Governor of New Hampshire in vetoing the resolution of that state’s legislature to ratify the proposed amendment. Myers, The' Process of Constitutional Amendment, Sen. Doc.No.314, 76th Cong., 3d. Sess. 34 (1940).
 

 [62]
 

 . See discussion p. 1144, supra.
 

 [63]
 

 .
 
 Leser v. Gamett,
 
 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922), dealt with a challenge to the nineteenth amendment. The court wrote:
 

 The remaining contention is that the ratifying resolutions of Tennessee and of West Virginia are inoperative, because adopted in violation of the rules of legislative procedure prevailing in the respective States. The question raised may have been rendered immaterial by the fact that since the proclamation the legislatures of two other States— Connecticut and Vermont — have adopted resolutions of ratification.
 

 Id.
 
 at 137, 42 S.Ct. at 218.
 

 [64]
 

 . As was indicated in
 
 United States ex rel. Widenmann
 
 v.
 
 Colby,
 
 265 F. 998 (D.C.Ct. of App.1920) official notification received under 1 U.S.C. § 106(b) (then Section 205 of the Revised Statutes of the United States) is conclusive.
 

 It will be observed that by this section is (sic) was the duty of the Acting Secretary of State [now the Administrator of GSA], upon receiving official notice from three-fourths of the several states (Constitution, art. 5 (sic)) that the proposed amendment had been adopted, to issue his proclamation. He was not required, or authorized, to investigate . and determine whether or not the notices stated the truth. To accept them as doing so, if in due form, was his duty.
 

 Id.
 
 at 999.
 

 [65]
 

 . In
 
 Leser v. Garnett,
 
 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922), the Supreme Court stated:
 

 As the legislatures of Tennessee and of West Virginia had power to adopt the resolutions of ratification, official notice to the Secretary, duly authenticated, that they had done so was conclusive upon him.
 

 Id.
 
 at 137, 42 S.Ct. at 218.
 

 [66]
 

 . It appears from the legislative history of the proposed twenty-seventh amendment that the seven-year time period was well considered and found necessary to prevent the amendment from pending for an inordinate period of time. See S.Rep.No.92-689, 92d Cong., 2d Sess., 1972; 118 Cong.Rec. 9552 (1972).
 

 [67]
 

 . See plaintiffs’ complaint pp. 42-47.